UNITED STATES *v.* UNION PACIFIC RAILROAD COMPANY.

1. The act of March 3, 1873 (17 Stat. 509), is a valid and constitutional exercise of legislative power. Congress, by requiring the Attorney-General to bring a suit in equity in the name of the United States in any Circuit Court against the Union Pacific Railroad Company and others, intended, not to change the substantial rights of the parties to the suit, but to provide a specific mode of procedure, which, by removing certain restrictions on the jurisdiction, process, and pleading which are in other cases imposed, would give a larger scope to the action of the court, and a more economical and efficient remedy than before existed.

2. The provisions authorizing process to be served without the limits of the district where the suit might be brought, and parties and subjects of controversy to be united which, in an ordinary chancery suit, would render a bill multifarious, are regulations of practice and procedure which are subject to legislative control.

3. Statutes have been frequently passed directing suits for specific objects to be brought by an attorney-general, and regulating the proceedings in them, such as a *quo warranto*, or a bill in equity against a corporation to test its right to the exercise of its franchises, or to declare them forfeited, or, if insolvent, to wind up its business and distribute its assets ; and the validity of such statutes has uniformly been recognized.

4. This bill having, on demurrer, been dismissed below, its sufficiency must be determined here by the provisions of said act ; for it cannot be supposed that Congress, in laying down in specific terms the subject-matter of the suit, and granting enlarged and peculiar powers to the court, intended that any other matters should be tried in the case.

5. This is confirmed by the fact that the same act provided other remedies for other subjects of controversy with the Union Pacific Railroad Company, and an effectual means of investigating all its affairs.

6. That act authorized a decree in favor of that company for money due for capital stock, for money or property received from it on fraudulent contracts, or which ought in equity to belong to it ; and also a decree in favor of it or of the United States for money, bonds, or lands wrongfully received from the latter, which ought in equity to be paid or accounted for.

7. Except in favor of the company or of the United States, there can, under this act, therefore, be no recovery, and none but such as was sanctioned by the principles of equity before it was passed.

8. The company might, by a cross-bill, have availed itself of the act ; but it refuses to do so, and demurs to the bill, thereby foregoing any relief in its favor in this suit. As it is conformable neither to the principles of equity nor to those of the common law to render a decree or a judgment in favor of a competent party who asserts no claim and declines to proceed in the case, there can be no recovery in this suit in favor of the company.

9. Though the bill sets up many fraudulent transactions on the part of the direc-

tors of the company and some of its stockholders, for which the other stockholders would be entitled to relief, the latter are not parties, and neither the frame of the bill nor the provisions of the act authorize any relief or recovery in their favor.

10. The United States sustains two distinct relations to the company; namely, that of the government creating it and exercising legislative and visitatorial powers; and that growing out of the contract contained in the charter and its amendment.

11. This bill exhibits no right on the part of the United States to relief founded on that contract. The company has completed its road, keeps it in running order, and carries all that is required by the government. To the latter nothing is due, and it has the security which by law it provided.

12. Nor does the bill show any thing which authorizes the United States as the depositary of a trust, public or private, to sustain this suit.

13. This interference by the Attorney-General with corporations on the ground of such a trust in the government is limited to two classes, to neither of which the present case belongs: 1. Where religious, charitable, municipal, or other corporations whose functions are solely public, and whose managers have destroyed or misappropriated the fund, or otherwise abused their functions; 2. Where other corporations exercise powers beyond those to which they are limited by the law of their organization.

14. While the court does not say that there is no trust in regard to the duties of the company which the United States can enforce in equity, it is of opinion that none such is shown in this bill, and that no case is made for any relief authorized by the act under which it was brought.

Appeal from the Circuit Court of the United States for the District of Connecticut.

The act of Congress making appropriations for the legislative, executive, and judicial expenses of the government, approved March 3, 1873 (17 Stat. 509), has the following language in its fourth and last section : —

" The Attorney-General shall cause a suit in equity to be instituted, in the name of the United States, against the Union Pacific Railroad Company, and against all persons who may, in their own names or through any agents, have subscribed for or received capital stock in said road, which stock has not been paid for in full in money, or who may have received, as dividends or otherwise, portions of the capital stock of said road, or the proceeds or avails thereof, or other property of said road, unlawfully and contrary to equity, or who may have received as profits or proceeds of contracts for construction or equipment of said road, or other contracts therewith, moneys or other property which ought, in equity, to belong to said railroad corporation, or who may, under pretence of having complied with the acts to which this is an addition, have wrong-

fully and unlawfully received from the United States bonds, moneys, or lands which ought, in equity, to be accounted for and paid to said railroad company or to the United States, and to compel payment for said stock, and the collection and payment of such moneys, and the restoration of such property, or its value, either to said railroad corporation or to the United States, whichever shall in equity be held entitled thereto.   Said suit may be brought in the Circuit Court in any circuit, and all said parties may be made defendants in one suit.   Decrees may be entered and enforced against any one or more parties defendant without awaiting the final determination of the cause against other parties.   The court where said cause is pending may make such orders and decrees, and issue such process as it shall deem necessary to bring in new parties, or the representatives of parties deceased, or to carry into effect the purposes of this act.   On filing the bill, writs of subpœna may be issued by said court against any parties defendant, which writ shall run into any district, and shall be served, as other like process, by the marshal of such district."

Following this, and constituting a part of the same section, are certain provisions for the future government of the railroad company and its officers, to wit: that its books and correspondence shall at all times be open to inspection by the Secretary of the Treasury; that no dividend shall be made but from actual net earnings, and no new stock issued or mortgages created without consent of Congress; and punishing directors who shall violate these provisions.   Also enacting that the corporation shall not be subject to the bankrupt law, and shall be subject to a *mandamus* to compel it to operate its road, as required by law.

A previous section directs the Secretary of the Treasury to withhold from every railroad company which has failed to pay the interest on bonds advanced to it by the government, all payments on account of freights or transportation over such roads, to the amount of such interest paid by the United States, and also the five per cent of the net earning of the roads due and unapplied as provided by law; and it authorized the companies who might wish to contest the right to withhold these payments to bring suit against the United States in the Court of Claims for the money so withheld.

The Attorney-General, pursuant to said fourth section, filed

a bill in equity in the Circuit Court of the United States for the District of Connecticut against the Union Pacific Railroad Company, the Wyoming Coal Company, the Credit Mobilier Company, and some one hundred and fifty individual defendants.

The bill, after reciting certain provisions of the acts of July 1, 1862 (12 Stat. 480), and July 2, 1864 (13 id. 356), and other acts amendatory thereof, in relation to the Union Pacific Railroad Company, and alleging that the company was organized in October, 1863, and its road opened in 1869; that a board appointed under the joint resolution of April 10, 1869, reported deficiencies of construction, requiring an expenditure of $1,586,100; that the United States issued to the company bonds to the amount of $27,236,512, which, with the interest, after deducting one-half the compensation for services, made its aggregate liability, Jan. 1, 1873, $33,435,221.77; and that under the mortgage it executed Nov. 1, 1865, to secure the payment of its first-mortgage bonds, it has issued and disposed of them to the amount of $27,237,000; charges that, April 16, 1867, it executed a mortgage to secure the payment of its so-called land-grant bonds, providing for the application of the proceeds of all sales of its land from time to time in the redemption of such bonds; that it has issued $10,400,000 of them, at seven per cent interest, $8,811,000 of which remain outstanding and unpaid; that it intends to sell land and apply the proceeds to redeem them, to that extent impairing the security of the United States for the repayment of its bonds issued to the company; that the company, on Sept. 1, 1869, issued $10,000,000 of so-called income-bonds, at ten per cent interest, secured by an indenture pledging the net income for the interest, after paying that on the first-mortgage bonds and land-grant bonds; that it has also issued $2,500,000 of eight per cent bonds, secured by mortgage on its bridge across the Missouri River; that for the redemption of the income-bonds it intends to issue and put in the market eight per cent sinking-fund bonds for $16,000,000, secured by mortgage on the property of the company; that it has a floating debt of $2,000,000, and has issued certificates of stock amounting to $36,762,300; that, July 16, 1868, it entered into an agreement with Godfrey & Wardell, which was assigned,

April 1, 1869, to the Wyoming Coal and Mining Company. purporting, among other things, to lease the coal lands of the Union Pacific Railroad Company for fifteen years; that the stock in said coal company, with the exception of one-tenth thereof, is owned by stockholders and managers of the railroad company; that said contract is a fraudulent method of obtaining for them a monopoly of coal supplies and of the coal trade on the line of the road, and was made in contravention of sect. 3 of the act of 1862; that on Sept. 1, 1869, the railroad company made a contract with the Atlantic and Pacific Telegraph Company to transfer to the latter the entire line of telegraph and appurtenances constructed for the railroad company under the acts of Congress; that the managers of the two companies are in part or in whole the same; and that the arrangement is a fraudulent device to make for said managers illegal profits, and to deprive the United States of its lawful security and advantage from the telegraph line.

The bill sets forth an agreement with the Omaha Bridge Transfer Company, and charges that it is a fraudulent arrangement on the part of the managers and stockholders to transfer to themselves personally profits which equitably belong to the railroad company.

The bill then charges, among other things, that the cost of the road was less than one-half of the sum represented by the stock and other pretended outstanding liabilities; that the larger part of the stock and bonds was issued by certain defendants in the name of the company, to enrich themselves; that the greater portion of the stock was never paid for in cash, or in any other thing of equivalent value; that the company is insolvent; that the government bonds and a portion of the first-mortgage bonds would have been sufficient to construct the road, without any expenditure from stock subscribed, or from land-grant bonds, or from income bonds; and that the stock, if paid in cash or its equivalent, would have been sufficient with less than one-half of the government bonds to complete the road, without the issue of bonds by the company; that at its organization in 1863 $2,177,000 stock was subscribed, on which ten per cent was paid; but no considerable

sum was afterward paid thereon, and no considerable amount of other subscriptions was ever made, except as part of the fraudulent transactions set forth ; that at the organization of the company the practical management of its business was committed to the executive committee, whereof one of the defendants, Durant, then vice-president, was elected a member ; that in August and September, 1864, he and his associates used the name of one H. M. Hoxie to disguise a contract made by them in the name of the company on one side, with themselves in the name of Hoxie on the other, to construct about two hundred and forty-six miles of the road between Omaha and the one hundredth meridian, at the price of $50,000 per mile, which was known to be in excess of a fair price therefor; that on Oct. 7, 1864, certain defendants, directors, and another, a stockholder, agreed with him to take large interests in this contract, with the design of becoming possessed of all the franchises and property of the company, and to use, manage, and dispose of the same for their private benefit ; that in execution of said design they obtained, in November, 1864, control of the charter of the Credit Mobilier of America, a corporation of Pennsylvania, and on March 15, 1865, entered into a contract in writing to conduct its operations in connection with the railroad company, outside of its charter, at an agency in New York ; that their intention was to substitute the Credit Mobilier as a contractor in the " Hoxie contract," and that on the same day they assigned to it the entire beneficial interest from the beginning in this contract, when the Credit Mobilier was organized to co-operate with the railroad company, defendant Durant being chosen its president; that they, in 1865 and 1866, purchased in the name of the Credit Mobilier, and had conveyed to it, large numbers of shares of stock of the railroad company, originally subscribed for in good faith at its organization ; that they caused to be allotted among themselves, as stockholders in the Credit Mobilier, the shares of railroad stock purchased from the original subscribers, and also large numbers of other shares subscribed by, or in the name of, the Credit Mobilier, on which it was pretended that thirty per cent had been paid, and also to be distributed among themselves a large amount of scrip procured by the Credit Mobilier from the railroad company in

pretended payment for construction under the "Hoxie contract," which scrip, instead of cash, they used in making pretended payments for the stock, certificates of which they procured to be issued to them severally by the officers of the railroad company.

It then states the division among certain defendants, in February, 1867, of one thousand two hundred and fifty first-mortgage bonds ($1,250,000), which they had caused the railroad company, to issue and deliver to the Credit Mobilier, on pretence of payment for road-building under the "Hoxie contract;" that in 1867 they procured transfers to the Credit Mobilier, with few exceptions, of all the outstanding original shares of stock of the railroad company; and that thenceforth they, the holders of all the stock of the Credit Mobilier, became also holders of substantially all the stock of the railroad company, and managed the same without regard to the rights or interests of the United States; that in December, 1867, they fraudulently distributed among themselves, as stockholders of the Credit Mobilier, in the way of dividends, sixteen thousand shares of Union Pacific railroad stock, issued to the Credit Mobilier, as assignee of the "Hoxie contract," on account of fifty-eight miles of railroad west of the one hundredth meridian, already constructed and paid for by the railroad company, and charges that they were from the beginning, and throughout, interested in the whole of the profits of the "Hoxie contract," and that all the work thereunder was done, and all measurements thereof and settlements therefor were made, by them in the double capacity of representatives of the two companies.

It then recites the facts and objects of the so-called "Oakes Ames contract," and charges that after the completion of the road, under the "Hoxie contract," to the one hundredth meridian, in October, 1866, they, as managers of the railroad company, went on, constructed, and paid for, at the price of about $27,500 per mile, a section of about one hundred and thirty-eight miles of road west of the one hundredth meridian, which was completed October, 1867; that they then entered into a series of writings intended in effect to constitute a contract with themselves as stockholders of the Credit Mobilier, for constructing at excessive prices six hundred and sixty-seven

miles of road, beginning at the one hundredth meridian, and including the one hundred and thirty-eight miles already built and paid for at much lower rates ; that the objects and effects of this transaction were to despoil the company of $3,000,000 of its stock and bonds, distributed among the defendants, under pretext of a contract to build a portion of its road already built and paid for, and to give them, under the disguise of a contract between parties in different interests, excessive prices for constructing other portions of the road, and to place the control of the company in seven trustees, and withhold its management and direction from the stockholders and directors; that the first three dividends under the " Oakes Ames contract " were received by the defendants named; that on June 3 and 7, 1868, all the trusts in the triplicate agreement (one of the writings connected with the " Oakes Ames contract "), in favor of the stockholders of the Credit Mobilier, were directly declared in favor of defendants individually, who received the dividends personally, and not as stockholders of the Credit Mobilier ; that thereafter defendants proceeded, as general copartners in form as well as in fact, with the seven trustees as their general managers, and that the last three dividends or allotments under the " Oakes Ames contract" were: July 3, 1868, $2,812,500, in first-mortgage bonds; July 8, 1868, $1,125,000, in cash ; Dec. 29, 1868, seventy-five thousand shares of stock at par value.

It then states the facts in regard to the pretended " Davis contract " in November, 1868, for the construction of about 125.23 miles of the road not embraced in the " Oakes Ames contract," which was assigned to the same persons for the same trusts as in the case of the " Oakes Ames contract; " and that the road to its western terminus was constructed by certain stockholders of the company, acting through the assignees, under cover of the " Davis contract."

After setting forth at large the dates and amounts of the several subscriptions which the defendants caused to be made to the stock of the railroad company by the Credit Mobilier, or to be assumed by it, as required by the " Hoxie contract," and the distribution of the stock among the defendants ; also the dates and amounts of the subscription to the stock of the

company made by the trustees under the "Oakes Ames contract" and under the "Davis contract," and its distribution in like manner; that neither the Credit Mobilier nor the trustees ever paid for any portion of their stock, but the excessive contract prices for construction were set off against the subscriptions; that the accounts of the railroad company under the three contracts are unsettled, with large balances claimed against the company; that defendants caused large amounts of money belonging to the company to be expended for unlawful purposes.

Certain alleged fraudulent transactions on the part of one of the defendants, a director, in relation to the sale of bonds, are set forth, in respect of which it is charged he is accountable to the company, which wrongfully refuses to compel him to account.

The bill then charges that the defendants made further divisions and distributions among themselves of the assets of the company, and engaged in other unlawful transactions and dealings with respect to its property, which the complainant is unable to set forth in detail, but which amount to about $17,000,000 in excess of the amounts particularly set forth, and that large amounts of the stock and bonds divided among defendants are still held by them or some of them.

The present condition of the company, with regard to its stock, finances, value of its road, and management, is then set forth, and it is averred to be doubtful whether the road would sell under the first mortgage for more than enough to pay those bonds, and that if the land-grant mortgage is allowed to be administered according to its terms, it will exhaust the security of the United States in the lands; that the company had no right to issue first-mortgage bonds or land-grant bonds or income bonds for distribution among stockholders as profits or for sale to them below their value, and such bonds to the extent so issued and distributed or sold are invalid, unless in the hands of *bona fide* purchasers without notice; that it has no right to exhaust the security of the United States by paying either principal or interest of land-grant bonds or income bonds; that the so-called trustees and assignees, under the "Oakes Ames contract" and "Davis contract," are jointly and sever-

ally responsible for all the stock and bonds issued to them; that the grants to the company in the acts of Congress were grants in aid of a public work of the United States, and are held in trust, to be applied to a public use; and that the property mentioned is also a trust for the payment to the United States of the subsidy bonds; that the present management of the company is in adverse interest to the United States; that the latter is entitled, as further security for its debt, and for the public objects provided for by Congress, to have declared that the management of the company should be subject only to the votes of the stockholders holding full-paid stock; to have the franchises, powers, and means so administered that unreasonable and unnecessary liabilities should not be created, and to have an account of reasonable and necessary expenditures and liabilities as a basis for regulating rates of fare under the eighteenth section of the act of 1862, and for determining the basis for estimating the five per cent of net profits; to have the franchises, powers, and property so administered as to secure the United States for the repayment of its bonds and promote the public objects of the corporation; to have maintained by the corporation, as a security for those objects, the character and credit which would ensue from a lawful administration of the franchises, powers, and means granted; and to have the lien of the United States remain a first lien, except as to the priority given to the first-mortgage bonds within the limits and for the purposes expressed by Congress; that the company neglects and refuses to state or render an account of cost on a lawful or just basis; that the stock of the Credit Mobilier, and the stock, bonds, and cash of the railroad company, held by and allotted, distributed, and divided among several of the defendants, were received in trust for others, whom complainant asks leave to make parties defendant when discovered.

The relief prayed for is, that the grants by the United States be declared to be held by the company for a public use, &c., and the property granted by the United States, &c., to be a trust fund to secure the bonds lent by them, &c.; that the construction contracts, and the land-grant and income mortgages be declared void; that an account be taken of the actual cost, &c., of the Union Pacific Railroad and Telegraph; the United

States bonds issued, &c.; the stock subscribed, sold, issued, &c.; and of the lands, &c., obtained from the United States; that persons unlawfully holding stock or other property of the company restore it, &c.

A large number of the defendants resided out of the district and State of Connecticut. Subpœnas directed to them were issued to the marshals of the several districts in which they respectively resided, and service thereof was there duly made upon them. There were three classes: 1. Those sued in their own right; 2. Those sued as executors of the estates of deceased persons domiciled at the time of their death out of said State; and, 3. Corporations organized under laws of some other State.

The railroad company demurred, alleging " that the complainant hath not, by its said bill, made such a case as entitles it in a court of equity to any discovery or relief from or against this defendant touching the matters contained in the said bill, or any of such matters."

The defendants who were served with process in the district of Connecticut likewise appeared, and filed demurrers to the bill for want of equity and for multifariousness.

A large number of those defendants who were served with process out of the district of Connecticut appeared *de bene esse,* and filed motions to dismiss the bill as to them, respectively, stating as the grounds of their motion that by the averments of the bill they were respectively non-residents of Connecticut, and that the process showed that it was served upon them out of the district.

Some of the defendants, residing out of Connecticut, demurred to the bill for want of equity and for multifariousness; others, who were non-residents of Connecticut, filed answers with clauses of demurrer.

The case was argued upon the bill and the pleadings, and the motions to dismiss. The demurrers were sustained, and an order entered overruling the motions.

The several non-resident defendants whose motions to dismiss were thus overruled, thereupon, under a *protestando,* demurred for want of equity and for multifariousness.

Several defendants, who had answered, withdrew their an-

swers after the decision of the court on the demurrers, and demurred.

At the April Term, 1874, the court below entered a general and final decree upon the bill, demurrers, and answers so filed, dismissing the bill as to all the defendants duly served with process. Whereupon the United States appealed to this court, and here assigns the following errors : —

The court below erred, —

1. In sustaining the demurrers.

2. In dismissing the bill as to certain defendants who had answered.

3. In dismissing it as to parties who had neither pleaded, answered, nor demurred.

The case was argued at the October Term, 1876, *The Solicitor-General*, *Mr. Aaron F. Perry*, and *Mr. J. Hubley Ashton* appearing for the United States, and *Mr. Sidney Bartlett* and *Mr. William M. Evarts* for the appellees.

A reargument having been ordered, it was again heard at the present term.

*The Attorney-General* and *The Solicitor-General* for the United States.

The objections taken by motion to the jurisdiction of the court below have not been duly brought before this court, inasmuch as the defendants did not object to the jurisdiction over their persons by plea (either instead of their motions or after these had been denied), but demurred for want of equity, and thereby waived their supposed personal privilege of being served within the district. The protest attached to the demurrers cannot impart to the proceeding by motion an effect which it did not otherwise possess, although it may save any objection duly made and entered.

However, in case it shall be considered that the question is duly presented here, we submit that process was lawfully served.

This proposition depends, of course, upon the validity of the act of March 3, 1873, the constitutionality of which is questioned not only by the motions but by the demurrers. It therefore seems convenient to consider all of these questions together.

I. It is suggested that in compelling the defendants alone, in contradistinction to the great mass of citizens, to obey process served outside of the State and district of the court which issued it, especially where such persons are executors or administrators authorized by some other State, the act is unconstitutional, because it deprives them of their property without due process of law, and sets up a special court different from those ordained and established by the general legislation of Congress.

It may be admitted that Congress cannot, by retrospective legislation, constitutionally make a substantial difference between citizens taken individually as regards the process to which these are either entitled or amenable ; and also that the word " substantial," so used, includes other rights than such as are elsewhere conferred by the Constitution.   Courts understand, as matter of law, that certain rights of suitors are important, and that others are not so, and discriminate accordingly. It is competent for Congress, and for the legislature of every State the constitution of which contains that guaranty, to make any provision as to process for a particular suit which does not materially affect the parties thereto.   Upon the general topic of due process, see *Murray's Lessee et al.* v. *Hoboken Land and Improvement Co.*, 18 How. 272.

In the present instance, the variation against the defendants, as regards service of process, is unimportant ; for it is indifferent to a suitor in equity whether he be sued in one district or in another, because —

1. The Constitution regards political or geographical limits as important for criminal, and perhaps other, trials at common law, but is significantly silent in this respect as to suits in equity.

In this connection, it is submitted that those who framed that instrument, and those who in a temper severely critical proposed the earliest amendments to it, turned their attention to the matter of the place where trials should be held, and that their repeated consideration and action resulted in an express provision in that respect for the trial of persons charged with crimes, — a qualified one for trials at common law, and an entire omission to regulate the trial of equity causes.

There also may be a qualified regulation of suits at common law, because it seems that trial by jury does, in the nature of things, savor of locality, so that it might well be suggested that a retrospective law subjecting a person to trial by a jury drawn from a place other than that of juries who by law try such matters for citizens in general, would violate one of his important rights.

It is otherwise where a trial by the court is competent. There, both principle and authority show that under our system venue is immaterial.

In *Burnam* v. *The Commonwealth* (1 Duv. (Ky.) 210), the court considered certain special provisions for the service of process created by the Kentucky act of 1862, c. 564, which authorized an action against the officials of the provisional government of that State. Those provisions operated retrospectively upon a definite number of individuals, yet the court said : " We cannot adjudge any provision of the act to be unconstitutional. As in other cases, when actual notice cannot be given to absent defendants, there must either be no remedy, or constructive notice must be substituted as sufficient ; and what constructive notice shall be given is a question of legislative discretion rather than of power. We see no abuse of sound discretion in the mode of service prescribed in this statute."

That decision seems entirely in point here. The only difference in regard to service of process is that Kentucky, having no political jurisdiction over the territory in which the defendants were supposed to be, was confined to a summons by publication; whereas here the United States has such jurisdiction, and therefore could authorize actual service.

2. The method of taking testimony in courts of equity renders subordinate geographical limits in that connection unimportant.

3. So also does their method of deciding upon issues of fact.

4. Courts of the United States, no matter where sitting, take notice of, and, whenever applicable, administer in behalf of suitors the laws of every other State. *Owings* v. *Hull*, 9 Pet. 607.

Therefore executors and administrators are at no special disadvantage in being sued outside of the State from which they derive their appointment.    A New York executor or administrator has in the courts of the United States in Connecticut every advantage and protection which he possesses in those of his own State.    *Green's Administratrix* v. *Creighton et al.*, 23 How. 90.

. II. The act of 1873 is said to be unconstitutional in empowering the United States to bring the suit.    The United States can only recover the moneys and property to which in equity it is entitled; and the general principles of equity jurisprudence as heretofore upheld and applied must ascertain and determine its title to relief.    A remedy only is furnished to enforce an existing right.

Among the parties against whom suit is authorized are those who, under pretence of having complied with the act to which this is an addition, wrongfully and unlawfully received from the United States bonds, moneys, or lands, which ought in equity to be accounted for and paid to it or to the company.

The bill states that certain persons, defendants, conspired to obtain, for their own corrupt purposes, and did obtain, control of the company, in its transactions with the United States, and in this way received bonds and lands.    If this be established, there may be something to be restored to the United States. It is true that the special purpose of the act is the relief of the company and its restoration to the *statu quo* contemplated by the charter.    But if, upon taking the accounts, something is to be restored to the United States, it seems that the above particular state of facts, together with the general prayer, will authorize such relief.    *English et al.* v. *Foxhall*, 2 Pet. 595. The probability of such a state of things seems anticipated by the act.

As to other matters, the act leaves the right of recovery where it originally was, — in the company.    It is true that the company is formally a defendant, but it is not uncommon for such parties to assume by appropriate pleading the relation of complainants in equity suits, and thereupon to partake in the relief decreed against their original co-defendants.

The United States is made the complainant in a suit the main

object of which is to give relief directly to the company and indirectly to the complainant, but which, in a certain event, contemplates direct relief also to the latter. The act relates to the remedy alone, and at most authorizes virtually one sort of multifariousness or misjoinder. That is a matter of form, which Congress can, at its pleasure, regulate and control.

Excluding from consideration the special sort of multifariousness above mentioned, — that is, taking for granted that the United States claims nothing here for itself, — the peculiarity of the act lies in authorizing the United States to bring a suit in which it is to recover nothing, the litigating parties on both sides being made defendants, and it being actor only so far as to ask intervention by the court among the defendants, according to the principles of equity; *i. e.,* by a sort of statutory interpleader which the United States is interested in bringing about and superintending until it becomes effective. The question, who shall be the complainant of record, is not, therefore, one of substance. It has been not unusual in the different States to provide by special statutes that debts may be sued upon and recovered, for the benefit of those really interested, in the name of some one designated by the act and not privy to the contract. *Cuyahoga Falls Co.* v. *McGaughey,* 2 Ohio St. 152; *Carey* v. *Giles,* 9 Ga. 253; *Crawford* v. *Branch Bank of Mobile,* 7 How. 279; *Hurdman* v. *Piper,* 50 Mo. 292. See also a like principle asserted in such cases as *Livingston's Lessee* v. *Moore,* 7 Pet. 469; *Watkins* v. *Holman's Lessee,* 16 id. 25; *Edwards* v. *Pope,* 3 Scam. (Ill.) 465; *Hepburn* v. *Curtis,* 7 Watts (Pa.), 300; *Kilby* v. *Chitwood,* 4 B. Mon. (Ky.) 91.

The circumstance that the United States is not a stranger to the company, but has always been represented within it by directors appointed by the President, has been from the first a standing suggestion of a sort of guardianship by it, and therefore of its right to apply to equity to enforce any course of honest or lawful dealing which it, being in a minority in the direction, may have been prevented from otherwise securing. The act of 1873 is no surprise, but is according to due process.

Again, considering the act to be an amendment to the charter, as it plainly is, it appears to be according to reasonable expectations founded upon the pecuniary and other extraordinary interests of the United States which are involved, that, if unlawful and fraudulent occurrences like those specified in the act should take place, the government would intervene, as complainant, to have the general condition of the company restored as far as practicable to that originally contemplated. Notice to this effect must be regarded as having by this state of things been served upon everybody.

The act evidently has in view a case in which the company if ever it were so, may not be *sui juris,* nor be able or willing to bring suit against its masters, or at least cannot be relied upon to maintain such a suit to its legitimate end. If this be true, the bill in question is a mere repetition in technical form of certain circumstances contemplated by the act, which, being the organic law of the suit, deals in generalities only.

Therefore, while the act of 1873 affords our only rule of allowance, that rule is expressed organically ; and, moreover, a suit brought under it need not take all the risks against which it insures.

It is said that the act deprives the defendants of due process, in allowing decrees against one or more parties, before the final determination of the case. The direction is that such partial decree may be given. Considering the context, the meaning is that this may be done, where otherwise it will be according to the substantial equities among the parties. Under such circumstances, it seems that no other party than that whose connection with the case is so ended could object; if otherwise, however, the matter is one merely of form, in relation to which Congress is competent to give directions.

III. A chief end of the creation and endowment of the Union Pacific company was the accomplishment of governmental purposes.

This is manifested in the title of the act of 1862; the special provisions for vesting the franchises in it; the appointment and the duties of the directors on the part of the United States;

the requirement of a continuous road for the use of the government for postal, military, and other purposes; the absolute and preferential character of the right of the United States to use the road; the reserved right to control the profits of the company's business. In addition to its rights as sovereign, the United States reserved certain rights as creditor, viz.: That the subsidy bonds should be paid by the company at their maturity, and in the meanwhile should be secured by mortgage; that five per cent of the net earnings should annually be applied to the principal and interest of such bonds; that one-half of the compensation payable to the company for public services should also be so applied. The company was not empowered by its charter to include its franchises in its first mortgage, or to make mortgages of its land grants or of its income.

IV. The endowment of the company is held as a public trust, and not as a mere donation. *Olcott* v. *The Supervisors*, 16 Wall. 691; *Worcester* v. *The Western Railroad Co.*, 4 Metc. (Mass.) 560; *Railroad Commissioners* v. *Railroad Company*, 63 Me. 269.

The company, however, by its charter has specific and extraordinary relations and duties of that sort. *Denison* v. *Union Pacific Railroad Co.*, 9 Wall. 579; *Union Pacific Railroad Co.* v. *Penniston*, 18 id. 5; *Tucker* v. *Ferguson*, 22 id. 572; *Rice* v. *Railroad Company*, 1 Black, 358.

V. Property held for public purposes becomes a trust-fund subject to the ordinary jurisdiction of equity. *Attorney-General* v. *Brown*, 1 Swans. 265; *Attorney-General of Ireland* v. *Mayor of Dublin*, 1 Bli. N. S. 312; s. c. 2 Cl. & Fin. 289; *Attorney-General* v. *Aspinall*, 2 My. & Cr. 613; *Parr* v. *Attorney-General*, 8 Cl. & Fin. 409; *Skinners' Company* v. *The Irish Society*, 12 id. 482.

Such jurisdiction is not visitatorial. *Dartmouth College Case*, 4 Wheat. 676.

VI. The obligations assumed by the company under the charter raise a trust in favor of the United States.

The charter is a contract affecting specific property, and this fastens a trust upon such property. *Legard* v. *Hodges*, 1 Ves. 477; 1 Perry, Trusts, sect. 82; *Seymour* v. *Freer*, 8 Wall. 214;

*Barings* v. *Dabney*, 19 id. 9; *Evans* v. *Coventry*, 5 DeG., M. & G. 920.

The word "condition" (see act of 1862, sect. 6) creates a trust. *Stanley* v. *Colt*, 5 Wall. 165; *Sohier* v. *Trinity Church*, 109 Mass. 1; *Wright* v. *Wilkins*, 2 Best & Sm. 248.

So the assets of corporations are said to be a trust fund for creditors. *Curran* v. *Arkansas*, 15 How. 307; *Railroad* v. *Howard*, 7 Wall. 409.

The objects to which the company was required by its charter to devote its entire property were the construction, operation, and maintenance of the road as an agency in governmental matters, and the security and ultimate payment of the bonds lent by the United States. A diversion of its property from these ends was a breach of trust. *Burke* v. *Smith*, 16 Wall. 395.

In this connection see the provisions in the following sections of the charter; viz., act of 1862, sects. 1, 3, 5, 6, 17, and 18; and act of 1864, sects. 2, 5, and 10.

VII. The property of the company and its proceeds were a trust fund for the payment of the bonds loaned by the United States to the company.

These bonds were secured not only by a condition to that effect (act of 1862, sect. 6), but also by a mortgage; and by stipulations that five per cent of the net profits, and one-half of the compensation for services to the United States, should be applied to pay them, and that the subscriptions for stock should be paid in cash.

VIII. The court has jurisdiction on the ground that the transactions were *ultra vires. Hare* v. *Railroad Company*, 2 Johns. & H. 111; *East Anglian Railroad Co.* v. *Eastern Counties Co.*, 11 C. B. 812; *Solomons* v. *Laing*, 1 R. I. 351, and 3 id. 14; *Zabriskie* v. *Railroad Company*, 23 How. 381; *Bissel* v. *Railroad Company*, 22 N. Y. 288; *Holmes* v. *Abattoir Company*, Law Rep. 1 Ch. 682.

As to the parties entitled to sue in order to correct action *ultra vires*, see *Bagshaw* v. *Railroad Company*, 2 Mac. & G. 389; *Spackman* v. *Lattimore*, 3 Gif. 15; *Kearns* v. *Leaf*, 1 Hem. & M. 681; *Hare* v. *Railroad Company, supra.*

For observations pertinent to the right of the United States,

considering its special relations to this company, to obtain relief in equity against its transactions *ultra vires*, see *Walworth* v. *Holt*, 4 My. & Cr. 635.

IX. Jurisdiction of equity to protect public interests against violations of charters. *Attorney-General* v. *Detroit*, 26 Mich. 266; *Attorney-General* v. *Tudor Ice Co.*, 104 Mass. 239; *The State* v. *Saline County Court*, 51 Mo. 366; *Attorney-General* v. *Mid. Kent Railway Co.*, Law Rep. 3 Ch. 100, &c.; *Commissioners* v. *Smith*, 10 Allen (Mass.), 435; *Attorney-General* v. *Railroad Companies*, 35 Wis. 511; *Dodge* v. *Woolsey*, 18 How. 331.

X. Jurisdiction to decree specific performance of the obligations of the charter as to the use of the property.

XI. Jurisdiction on the grounds of waste and fraud. *Clagett* v. *Salmon*, 5 Gill & J. (Md.) 334; *Maryland* v. *Railroad Company*, 18 Md. 193; *Kearney* v. *Leaf*, 1 Hem. & M. 708; *Jackson* v. *Ludeling*, 21 Wall. 616; *Jones* v. *Bolles*, 9 id. 364.

It is therefore submitted, in conclusion: —

1. That the United States has beneficial or property interests involved in the transactions complained of, which might be enforced at the suit of an individual, and concerning which it stands toward the railroad company as a third party. It may enforce its rights in the same way and has the same rights as such party.

2. That the act of 1873 authorizes a suit in equity without express restrictions, specifying several purposes, but not excluding others, and not requiring the cause of action to be split. It joins only such parties and such causes of action as would be joined in an ordinary equity suit to accomplish the purpose, and looks only to the ordinary incidents of a chancery suit. The provision for process is necessary, and the only provision in the act which is necessary to the relief asked. But if there should be greater departure from ordinary procedure than is supposed, there is none involving constitutional objections.

3. That the United States having the two kinds of interest described, the relief which would be granted in an equity suit, without a statute, is coextensive with the relief specified in different terms by the statute. It is inadmissible under such

circumstances to construe the statute as an arbitrary one, conflicting with rights of property; and without such construction there is no constitutional objection to it.

4. That, construed however rigorously, the constitutional objections supposed to exist against the relief prayed, as to past transactions, do not apply to the preventive remedies sought, which are themselves important to the ends of justice.

5. That the demurrers are untenable, in any view of the case, and should be overruled.

*Mr. Sidney Bartlett* and *Mr. W. G. Russell, contra.*

I. As to the constitutionality of the act of March 3, 1873.

1. The act under which this suit was brought violates the fundamental right of citizens under a free government to " equality before the law," and may, therefore, be held void, without reference to any express constitutional limitation or prohibition. The doctrine that there are implied reservations of individual rights, even in the broadest grant of legislative power, has been judicially recognized and asserted; and among them that of equality before the law has been, and must be, included. *Wilkinson* v. *Leland*, 2 Pet. 627; *Calder* v. *Bull*, 3 Dall. 386; *Taylor* v. *Porter*, 4 Hill (N. Y.), 140; *Holden* v. *James*, 11 Mass. 396; *Durkee* v. *Janesville*, 28 Wis. 464; *Bagg's Appeal*, 43 Pa. 512; *Loan Association* v. *Topeka*, 20 Wall. 655; Cooley, Const. Lim., pp. 487–490.

The express grants of constitutional power by which the validity of the act in question is to be determined are to be found in art. 1, sects. 1 and 8, of the Constitution. Admitting that under them the power to constitute tribunals inferior to the Supreme Court includes that of ordaining the extent and mode in which the judicial power shall be exercised, subject to the provisions defining its limits, we yet submit that the grants are subject to the limitation that they are not to be so construed as to imply a surrender by the people of " those reserved individual rights which grow out of the nature of a free government," a grant of which cannot be assumed to " lurk under any general grant of legislative power; " and that under such interpretation any act which undertakes to destroy or impair the great reserved right of equality before the law cannot be deemed an exercise of legislative power.

It is not claimed that the act is void and unconstitutional merely because it is retrospective in its action, or is special legislation affecting only a single case, or confers upon the plaintiff in judicial proceedings new and material privileges and exemptions from existing rules of law, or that it imposes upon the defendants in conducting their defence new and onerous conditions at variance with pre-existing rules of law; but because it combines all these objectionable elements, and thus passes the limits of constitutional legislation, and exercises a power everywhere recognized as arbitrary and tyrannical.

2. The act is unconstitutional and void, as repugnant to the Fifth Amendment to the Constitution of the United States. " Nor shall any person . . . be deprived of life, liberty, or property without due process of law."

In construing this clause, its history and the circumstances under which it was adopted and the purpose for which it was designed may be considered.

It is matter of common knowledge that equality before the law was then recognized as a fundamental principle; that much solicitude was expressed that it had not been sufficiently guarded in the Constitution then proposed; and that the amendment in question was, with others, adopted at the earliest possible date, for the purpose of protecting the citizen in this right against legislative encroachments. Federalist, No. 84; Journal of Congress (1787, 1788), vol. xiii., Appendix, pp. 64–94.

If it be capable, the language is to be so construed, so that the words " due process of law " shall be extended to the whole course of judicial " proceedings, shaping, regulating, and enforcing remedies which affect the rights and safety of the citizen, or his means or facilities of defence, and to preclude all possible special legislation which should attempt in relation thereto to discriminate between one citizen and another."

The adjudicated cases in which the terms of the Fifth Amendment and equivalent or analogous terms of constitutional limitation have been considered and applied, support our construction. *Wayman* v. *Southard*, 10 Wheat. 1; *Murray's Lessee* v. *Hoboken, &c., Company,* 18 How. 272; *Davidson* v. *New Orleans,* 96 U. S. 97; *Merrill* v. *Sherburne,* 1 N. H. 199; *Bates* v. *Kimball,* 2 Chip. (Vt.) 77; *Lewis* v. *Webb,* 3 Me. (Greenl.) 326; *Dur-*

*ham* v. *Lewiston*, 4 id. 140; *Holden* v. *James*, 11 Mass. 396; *Picquet, Appellant*, 5 Pick. (Mass.) 65; *Davison* v. *Johonnot*, 7 Metc. (Mass.) 388, 393; *Simonds* v. *Simonds*, 103 Mass. 572; *Taylor* v. *Porter*, 4 Hill (N. Y.), 140; *Westervelt* v. *Gregg*, 12 N. Y. 202; *Wynehamer* v. *The People*, 13 N. Y. 378; *O'Conner* v. *Warner*, 4 Watts & S. (Pa.) 223; *Greenough* v. *Greenough*, 11 Pa. 489; *De Chastellux* v. *Fairchild*, 15 id. 18; *Ervine's Appeal*, 16 id. 256; *Bagg's Appeal*, 43 id. 512; *Huber* v. *Riley*, 53 id. 112; *Wally's Heirs* v. *Kennedy*, 2 Yerg. (Tenn.) 554; *Bank of State* v. *Cooper*, 2 id. 599; *Budd* v. *State*, 3 Humph. (Tenn.) 483; *Teft* v. *Teft*, 3 Mich. 67; *Bull* v. *Conroe*, 13 Wis. 233; *Durkee* v. *Janesville*, 28 id. 464; Journal of Congress (1787–88), vol. xiii., Appendix, pp. 64–94; 2 Kent, Com. 13; Story, Const., sect. 1945; Cooley, Const. Lim., pp. 438, 441, 490.

By the general law of the land applicable to all cases at the date of the act, and still applicable to all other like cases, certain established rules and principles of equity jurisprudence were and are of binding force, governing, as to the joinder of parties and the joinder of causes of action; and among them the rule that "uniting in one bill several matters, perfectly distinct and unconnected, against one defendant, or the demand of several matters of a distinct and independent nature against several defendants in the same bill," is inconsistent with the right of defence, and cannot be upheld in a court of equity.

Equally established is the rule that there shall be but one final decree in which the rights and interests of the parties are to be settled.

These rules are by the terms of this act suspended and annulled.

The act is at variance with the right to due process of law, in another respect still more important.

By the law as it then existed, and still exists as to all other cases, the jurisdiction of each circuit court over the persons against whom its process issues was confined to the district in which the court sits.

That the jurisdiction and process of these courts were confined by their organization itself within the limits of their respective districts, without regard to the limitation imposed by

the eleventh section of the Judiciary Act, was laid down by Mr. Justice Washington, as follows : —

" The division and appointment of particular courts for each district necessarily confines the jurisdiction of the local tribunals within the bounds of the respective districts within which they are directed to be holden." *Ex parte Graham*, 3 Wash. 456. See also *Picquet* v. *Swan*, 5 Mas. 35 ; *Toland* v. *Sprague*, 12 Pet. 300 ; *Day* v. *Newark Co.*, 1 Blatch. 628 ; *Pomeroy* v. *New York & Hudson River Railroad Co.*, 4 id. 120.

But from abundant caution, Congress, by the eleventh section of the Judiciary Act, provides expressly that " no civil suit shall be brought before either of said courts (the Circuit or District Court) against an inhabitant of the United States, by any original process, in any other district than that whereof he was an inhabitant, or in which he shall be found at the time of serving the writ."

In this condition of the statute law Congress intervenes, and provides for this one case against certain defendants, not only a mode of procedure unknown to the general rules of law, but a special and isolated jurisdiction, vested in some one circuit court to be designated by the Attorney-General, to which, by the law then and still in force, as to all other citizens, they could not be subjected, and to which by possibility no one of them was, but for this act, subjected.

Under authority of the act providing that, " on filing the bill, writs of subpœna may be issued by said court against any parties defendant, which writ shall run into any district, and shall be served as other like process by the marshal of such district." Writs of compulsory process in a suit commenced in the Circuit Court for the District of Connecticut have been issued from said court into different States, and served upon persons not inhabitants of said district nor found within its limits.

In judging of the character of the act as affecting its constitutional validity, we are entitled to look to the act itself, and not merely to the course which has been pursued under it.

It is obvious that, under its provisions, suit might well have been brought in a district where, by general law, no one of the defendants was subject to the jurisdiction, and that to the act

itself this objection lies with equal force on behalf of all the defendants alike.

Equally obvious is it that the act, with reference to its constitutional validity, is to be tried by the same tests which should be applied to any similar act conferring in favor of a particular individual a like peculiar jurisdiction against particular designated defendants, against whom a cause of action might exist.

Under it, at the discretion of the Attorney-General, each of these defendants might be summoned, and, in order to defend his right, be compelled to appear, before a circuit court of the United States in a district remote from his home and his means of defence, into which but for this act he could not be summoned, and into which no other citizen can be compelled, which is in the nature of things a pecuniary burden and something more.

This is imposing upon him an onerous condition as to his defence.  *Ex parte Graham, supra.*

This objection applies with added force in favor of the corporations made defendants; for they being, for purposes of jurisdiction, citizens and inhabitants of the several States in which they are established and under whose laws alone they exist, not only cannot have a domicile elsewhere, but are incapable of being away from home, and hence are in no event subject to process except in the State or district where they are created or have their domicile.  *Bank of Augusta* v. *Earle*, 13 Pet. 519; *Baltimore & Ohio Railroad* v. *Harris*, 12 Wall. 65; *Railway Company* v. *Whitton*, 13 id. 270; *Day* v. *Newark India-rubber Manufacturing Co.*, 1 Blatch. 628; *Pomeroy* v. *New York & Hudson River Railroad Co.*, 4 id. 120; *Sayles* v. *Northwestern Insurance Co.*, 2 Curt. 212.

3. The act is unconstitutional and void in its provisions affecting the jurisdiction and mode of procedure in the present suit, because it is in violation of sect. 1 of art. 3 of the Constitution of the United States, and is an exercise of judicial power by the Legislative Department.

By that article, in connection with arts. 1 and 2, declaring how the legislative and executive powers shall be vested, it cannot be questioned that the partition and separation of these

powers is distinct and complete. *Dash* v. *Van Kleeck*, 7 Johns. (N. Y.) 477; *Merrill* v. *Sherburn*, 1 N. H. 199.

Congress deals directly with a cause between adverse parties, and prescribes certain rules of procedure, or, in other words, issues its mandate to the court as to the manner in which a cause shall be conducted and determined.

It declares that facts which, under the ordinary administration of the rules of equity jurisprudence, would justify the defence of multifariousness shall be held by the court not to sustain that defence, and thus in a particular case itself exercises the judicial function.

In *O'Connor* v. *Warner*, 4 Watts & S. (Pa.) 223, Gibson, C. J., says: "A legislative direction to perform a judicial function in a particular way would be a direct violation of the Constitution, which assigns to each organ of the government its exclusive function and a limited sphere of action. No one will assert that a court would be bound by a mandate to decide a principle or a cause a particular way. Such a mandate would be a usurpation of judicial power." p. 227.

A legislative mandate, that in a particular case the court shall decide as to one defence in a particular way, is obviously open to the same objection as an order so to decide the case itself. *Picquet, Appellant*, 5 Pick. (Mass.) 65; *Bates* v. *Kimball*, 2 Chip. (Vt.) 77; *Lewis* v. *Webb*, 3 Me. 326; *Merrill* v. *Sherburn*, 1 N. H. 199; *Greenough* v. *Greenough*, 11 Pa. 489; *De Chastellux* v. *Fairchild*, 15 Pa. 18; *Waters* v. *Stickney*, 12 Allen (Mass.), 1.

4. The act is unconstitutional, and inoperative to maintain jurisdiction in this suit, because it fails to confer that jurisdiction on the Circuit Court of the District of Connecticut, or on any other court.

The power to ordain and establish courts inferior to the Supreme Court is vested in Congress. Setting aside the objection to special legislation for a particular case, we may admit the power of Congress to confer additional jurisdiction on any one or on all the inferior courts it has established, in such manner as to include the present suit. To do so, however, involves directly the increase of territorial jurisdiction of all or of some one of such courts; for neither all nor any of them had, with-

out the aid of the act, power to issue the process for which it provides.

Congress then might have conferred the required additional territorial jurisdiction on all or on any one of said courts. It has in fact done neither.

The action of the Attorney-General was required not to determine in which of the circuit courts he should bring his bill, but which should have jurisdiction of it when brought.

This constitutes a case of delegated legislative power which Congress was not competent to grant, or the Attorney-General to exercise.

It is by his will that this act becomes operative, if it operates at all, to confer jurisdiction on the Circuit Court for the District of Connecticut. Congress described and defined the jurisdiction, and declared that some one circuit court of the United States should possess it, but omitted to designate that one court. The power to ordain, establish, or determine the jurisdiction of the inferior courts is one which it is not left to an executive officer to exercise in whole or in part.

5. The act is void and inoperative as to those defendants who are made parties to the bill as executors or administrators. It is not competent for Congress to subject them to the jurisdiction of the court in this suit, because an enactment to that effect is at variance with their established common-law right to be exempt from suit or liability except in that State from which their powers are derived. Their authority to appear and defend, and their liability to be compelled so to do, are limited to such State. The limit of their liability is the subject of State legislation only, which Congress can neither increase nor diminish. *Vaughan* v. *Northup*, 15 Pet. 1; *Dixon's Executors* v. *Ramsay*, 3 Cranch, 319; *Armstrong* v. *Lear*, 12 Wheat. 169; *Low* v. *Bartlett*, 8 Allen (Mass.), 259.

II. As to the case made by the bill.

The entire object to be accomplished by the act is to procure restoration or pecuniary compensation for past wrongs or frauds suffered by the company during its early history, which, it is alleged, were committed by a portion of its directors and by others, members of as well as strangers to it.

There is thus raised the question, Does the government

stand in the attitude or fill such relations to the company as would enable it, upon legal principles, without the act, to maintain such a suit?

A scrutiny of the decided cases and an examination of the principles on which they rest warrant the assertion of the following propositions: —

1. Such wrongs are to be redressed by the action of the corporation itself, or, on its neglect or refusal, by any one or more of its shareholders.

2. The only exceptions to this rule are either when such corporation holds its property to charitable uses, or when, by legislation, its property is impressed with a public trust.

In the case of charitable uses, the government, as *parens patriæ*, has the prerogative right and duty to redress such wrongs, because, from the contingent character of the possible beneficiary, there is no *cestui que trust* capable in law of redressing the same; and by statute the other class of corporations hold their property on a declared, expressed public trust, for the violation of which it is the prerogative right of the State to recover. *Attorney-General of Ireland* v. *City of Dublin*, 1 Bli. N. s. 306, 347.

The only other remaining class of corporations whose past wrongs or injuries can by the law of England be now the subject of suit by the State consists of municipal or other public corporations. It is settled that the right of the State thus to interpose had no existence until the same was created by the statute of William IV. (1835).

The prior condition of the law in England is displayed by counsel, and conceded by the court, in *Attorney-General* v. *Corporation of Liverpool*, 1 Myl. & Cr. 201. The doctrine is thus stated by Lord Campbell in *Parr* v. *Attorney-General*, 8 Cl. & Fin. 431: "Before the Municipal Corporations Act passed, corporate property was not subject to any trust: the corporations might do with it what they pleased, and, generally speaking, no relief could be obtained at law or in equity for any misapplication of it." See also *Attorney-General* v. *Aspinall*, 2 Myl. & Cr. 613; *Attorney-General* v. *Poole*, 4 id. 17; *Attorney-General* v. *Wilson*, Cr. & Ph. 1.

The question of the right of a State, by suit in its name, to

redress and restore pecuniary losses of political corporations arising from the frauds of their officers was thoroughly discussed, and, it is believed, all the authorities now cited by the government collected by eminent counsel in *People* v. *Ingersoll*, 58 N. Y. 1.   And it was determined that the State could not maintain the action, but that redress must be sought by the corporation.

If it be held that the doctrine of the English courts, that, prior to the statute of William IV., property of political or municipal corporations is not so held in trust as to warrant the interference of the State for its recovery, has no application under our institutions; that not only are such corporations to be deemed public corporations, but that all frauds or wrongs by which their property is diminished or lost are to be redressed and restoration obtained, not by the corporation but by the State (for it would seem the right cannot exist in both), the inquiry then arises, Can this railroad company be held to belong to the same class as municipal or political corporations?

If its character had not been discussed and determined by this court to be one where the property is " neither in whole nor in part the property of the government.   The ownership is in complainant, a private corporation, though existing for the performance of public duties " (*Railroad Company* v. *Peniston*, 18 Wall. 5), this point might call for a more extended discussion.

That the company exists for a public purpose, and could only be created on that ground, by no means constitutes it a public corporation.   To use the language of Mr. Chief Justice Marshall, " Corporations are only public when the whole interest and trust franchises are the exclusive property and domain of the government itself."   See *National Bank* v. *Commonwealth*, 9 Wall. 353.

Assuming that the company does not belong to the class of public or charitable corporations, holding all its property in trust, it is submitted that the perusal of the cases relied on by the government to maintain its bill will show with distinctness, —

*First*, That although the power of the government has in

England been recently extended to the restraint by information in equity of excesses or abuses of corporate franchises (see *Attorney-General* v. *Great Northern Railway Co.*, 1 Drew & Sm. 154), — a doctrine which is in controversy in this country (see cases cited at the end of sect. 927, 2 Story, Eq.), — yet no case has been or can be cited where, in any proceeding in equity by the State alone against a corporation, except in the cases of public charity or public trust, any attempt has ever been made to recover to its own use or that of the corporation compensation or restoration for losses suffered by maladministration.

*Second*, That not only is there an absence of any such case or cases, but the authorities show that the only method known to the law by which such restoration or compensation can be attained is for the government to permit the corporation or party injured and seeking redress or compensation to join with the information of the Attorney-General, filed in behalf of the government, seeking to enjoin and restrain an existing abuse, a bill in behalf of the injured corporation or party seeking compensation for such loss.    *Attorney-General* v. *Wilson* (Cr. & Ph. 1) is an illustration of this rule, and contains an exposition of the doctrine.    See also *Attorney-General* v. *Johnson*, 2 Wils. Ch. 87; *Attorney-General* v. *Forbes*, 2 Myl. & Cr. 123; *Soltan* v. *De Helds*, 2 Sim. N. S. 151; *Attorney-General* v. *Sheffield*, 3 De G., M. & G. 304.

If this assumed right of action depends upon the inaction of the corporation or the complicity of its present managers, seemingly such right exists only in favor of stockholders or of some party who fills substantially that relation.

If it is asserted to result from trust, or from the relation of the government as mortgagee or as creditor, then it in no manner rests on the inaction or refusal of the corporation or its officers to pursue its remedies; but the direct right exists independently of such inaction or refusal, so that all the allegations of the bill, in that regard, may be stricken out as valueless.

If it is placed on the ground of trust, then, since it seeks to follow trust property into the hands of third parties, by reason that their holding and possession are derived from fraud, to

which the managers of the corporation were parties, the asserted trust must be shown to be one in which the title to the whole property of the corporation is held by it in trust for the government, of which trust, aside from any alleged actual notice, the parties have by the public charter notice.

There can be no such trust derived from this charter.

Perhaps it may be conceded that, as the result of the agreement contained in the charter, the road of the company, upon its completion, and all its appurtenances, are, as between the parties, held in what may perhaps be called a *quasi* trust to carry out and give effect to all its declared duties to the government in relation to the construction and use of the road, and that the government might on neglect or refusal, by proceeding in equity, compel the execution of that trust, and that its redress for the violation of the trust is not limited to the forfeiture set forth in the charter. *Knox* v. *Guy*, Law Rep. 5 H. L. 667.

But neither the act nor the bill is framed to enforce the performance of such trusts. The road has been completed to the acceptance of the government, and the company has heretofore, at all times, fulfilled each and all of its duties.

To sustain this act and bill, there must be shown, as resulting from the charter, a further agreement, under which not only is the property of the company held in trust to secure the completion and use of the road by the government, but that although the company has completed the work and is discharging all its duties to the government, yet, lest in some future contingency the performance of those duties may be imperilled, all its assets are to be for ever held in trust, so that at all times whensoever by the misapplication or the fraudulent abstractions of its property by its managers (or strangers with notice of the trust), the same shall be diminished, the State may interfere, not merely to restrain, but by suit to enforce restoration from the wrong-doers, be they managers or third parties.

The seemingly conclusive argument against the existence of any such trust is to be found in the fact that the endowments are, by the same act creating the company, bestowed upon the same terms and like conditions, in all respects, upon several State corporations who can hardly, by the acceptance of the

endowments, be deemed to have subjected their entire property to a trust of this character.

It has been suggested by the counsel for the government that although it shall be held that the causes of action are limited by the act on which the bill rests, yet, within that act, the United States may maintain this bill: 1, as mortgagee; 2, as creditor; 3, as being authorized, under sect. 18 of the act of 1862, whensoever the income of the road shall exceed ten per cent, to reduce its tolls; 4, as being entitled, under the sixth section of the same act, to five per cent of net income.

The results aimed at by the act are the restoration of money or property of which the company has in times past been despoiled, and to this it is in terms confined.

It nowhere contemplates a suit for an account of the actual cost of the road, or what would have been such actual cost if its assets had not been abstracted or diminished by the alleged wrongs set forth in the act, so that it may be determined whether its power of reducing tolls may or not now, under the eighteenth section, be exercised. Nor does the act authorize a suit to determine whether the net earnings have not been effected or reduced, and the five per cent diminished, by the frauds or abstractions for which it directs suit to be brought. It discloses no controversy between the company and the government as to the cost or as to the five per cent. The wrongs set forth in the act, for which suit is authorized, have no connection with either of these subjects.

As to the rights of the government as mortgagee or as creditor, it is to be noted that the assets or property alleged to have been wasted or abstracted are not embraced by the mortgage. That mortgage does not comprehend the shares of the company, its bonds, or its choses in action, which are to be reclaimed or restored under the act.

But if it were true that the act was framed to vindicate and protect the rights of the government as a mortgagee whose debt has not matured, it will be impossible, we think, to find authority to recover back from the mortgagor or a third party, by a bill or information in equity, the pecuniary value of past waste. It would be alike impossible to recover as against third parties who profited by the waste.

The rights of the government as a creditor (and a creditor no part of whose debt has matured) even to restrain waste by its debtor of his general assets would hardly seem to require discussion.

MR. JUSTICE MILLER delivered the opinion of the court.

The Union Pacific Railroad Company brought the suit provided for in the second section of the act of March 3, 1873, 17 Stat. 508. The case was argued before us on appeal from the judgment of the Court of Claims. All the questions which concern the obligations of the company to pay money to the government, either by way of freight or government transportation, or for the five per cent on the net income of the road, were raised in that suit.

The Attorney-General, in pursuance of the directions of the fourth section of the act, filed this bill in equity. Many of the defendants demurred to the bill generally, and at the head of this class is the railroad company.

The Circuit Court sustained this demurrer and dismissed the bill, and the case is before us on appeal from that decree.

No suggestion is made either here or in the court below of any defect in the bill which can be remedied by amendment. The bill is very elaborate, very ably drawn, and no doubt presents in a very intelligible manner every thing which the facts known or suspected justified the pleader in placing in any bill which can be framed under the special statute authorizing the suit.

The question for decision is, therefore, squarely presented to us, as it was to the Circuit Court, whether, by the aid of that statute, and within the limits of the power it intended to confer, this bill can be sustained. under the general principles of equity jurisprudence.

We say by the aid of that statute, because it is conceded on all sides that without it the bill cannot stand. The service of compulsory process on a party residing without the limits of the district of Connecticut who is not found within them, is expressly forbidden by the general statute defining the jurisdiction of the circuit courts. Parties and subjects of complaint having no proper connection with each other are grouped

together in this bill, and they, by the accepted canons of equity pleading, render it multifarious. This, and other matters of like character, which are proper causes of demurrer, are fatal to it, unless the difficulty be cured by the statute.

When we recur to its provisions, which are said to authorize these and other departures from the general rules of equity procedure, counsel for the appellees insist that it is unconstitutional, not only in the particulars just alluded to, but that it is absolutely void as affecting the substantial rights of defendants in regard to matters beyond the power of Congress.

If this be true, we need inquire no further into the frame of the bill, and we therefore proceed, on the threshold, to consider the objections to the validity of the statute.

The Constitution declares (art. 3, sect. 2) that the judicial power shall extend to all cases in law and equity arising under the Constitution, the laws of the United States, and the treaties made, or which shall be made, under their authority; and to controversies to which the United States shall be a party.

The matters in regard to which the statute authorizes a suit to be brought are very largely those arising under the act which chartered the Union Pacific Railroad Company, conferred on it certain rights and benefits, and imposed on it certain obligations. It is in reference to these rights and obligations that the suit is to be brought. It is also to be brought by the United States, which is, therefore, necessarily the party complainant. Whether, therefore, this suit is authorized by the statute or not, it is very clear that the general subject on which Congress legislated is within the judicial power as defined by the Constitution.

The same article declares, in sect. 1, that this " power shall be vested in one supreme court and in such inferior courts as the Congress may, from time to time, ordain."

The discretion, therefore, of Congress as to the number, the character, the territorial limits of the courts among which it shall distribute this judicial power, is unrestricted except as to the Supreme Court. On that court the same article of the Constitution confers a very limited original jurisdiction, — namely, " in all cases affecting ambassadors, other public ministers, and consuls, and cases in which a State shall be a party," — and an

appellate jurisdiction in all the other cases to which this judicial power extends, with such exceptions and under such regulations as the Congress shall make.

There is in this same section a limitation as to the place of trial of all crimes, which it declares shall (except in cases of impeachment) be held in the State where they shall have been committed, if committed within any State.

Article 6 of the amendments also provides that in all criminal prosecutions " the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." These provisions, which relate solely to the place of the trial for criminal offences, do not affect the general proposition. We say, therefore, that, with the exception of the Supreme Court, the authority of Congress, in creating courts and conferring on them all or much or little of the judicial power of the United States, is unlimited by the Constitution.

Congress has, under this authority, created the district courts, the circuit courts, and the Court of Claims, and vested each of them with a defined portion of the judicial power found in the Constitution. It has also regulated the appellate jurisdiction of the Supreme Court.

The jurisdiction of the Supreme Court and the Court of Claims is not confined by geographical boundaries. Each of them, having by the law of its organization jurisdiction of the subject-matter of a suit, and of the parties thereto, can, sitting at Washington, exercise its power by appropriate process, served anywhere within the limits of the territory over which the Federal government exercises dominion.

It would have been competent for Congress to organize a judicial system analogous to that of England and of some of the States of the Union, and confer all original jurisdiction on a court or courts which should possess the judicial power with which that body thought proper, within the Constitution, to invest them, with authority to exercise that jurisdiction throughout the limits of the Federal government. This has been done in reference to the Court of Claims. It has now jurisdiction only of cases in which the United States is defendant. It is just as

clearly within the power of Congress to give it exclusive jurisdiction of all actions in which the United States is plaintiff. Such an extension of its jurisdiction would include all that the statute under consideration has granted to the Circuit Court.

It is true that Congress has declared that no person shall be sued in a circuit court of the United States who does not reside within the district for which the court was established, or who is not found there. But a citizen residing in Oregon may be sued in Maine, if found there, so that process can be served on him. There is, therefore, nothing in the Constitution which forbids Congress to enact that, as to a class of cases or a case of special character, a circuit court — any circuit court — in which the suit may be brought, shall, by process served anywhere in the United States, have the power to bring before it all the parties necessary to its decision.

Whether parties shall be compelled to answer in a court of the United States wherever they may be served, or shall only be bound to appear when found within the district where the suit has been brought, is merely a matter of legislative discretion, which ought to be governed by considerations of convenience, expense, &c., but which, when exercised by Congress, is controlling on the courts.

So, also, the doctrine of multifariousness; whether relating to improperly combining persons or grievances in the bill, it is simply a rule of pleading adopted by courts of equity. It has been found convenient in the administration of justice, and promotive of that end, that parties who have no proper connection with each other shall not be compelled to litigate together in the same suit, and that matters wholly distinct from and having no relation to each other, and requiring defences equally unconnected, shall not be alleged and determined in one suit. The rule itself, however, is a very accommodating one, and by no means inflexible. Such as it is, however, it may be modified, limited, and controlled by the same power which creates the court and confers its jurisdiction. The Constitution imposes no restraint in this respect upon the power of Congress. Sect. 921 of the Revised Statutes, which has been the law for fifty years, declares that when causes of like nature or relating to the same question are pending, the court may consoli-

date them, or make such other orders as are necessary to avoid costs and delay.   It is every-day practice, under this rule, to do what the statute authorizes to be done in the case before us.

But it is argued that the statute confers a special jurisdiction to try a single case, and is intended to grant the complainant new and substantial rights, at the expense and by a corr sponding invasion of those of the defendants.

It does not create a new or special tribunal.   Any circui court of the United States where the bill might be filed was by the act, invested with the jurisdiction to try the case.   Nor was new power conferred on the court beyond those which we have regarded as affecting the mode of procedure.   It seems to us that any circuit court, sitting as a court of equity, which could by its process have lawfully obtained jurisdiction of the parties, and considered in one suit all the matters mentioned in the statute, could have done this before the act as well ɩ afterwards.

But if this be otherwise, we are aware of *no constitutio* objection to the power of the legislative body to confer on existing court a special jurisdiction to try a specific matt which in its nature is of judicial cognizance.

The principal defendant in this suit, the one around which a the contest is ranged, is a corporation created by an act whic reserved the right of Congress to repeal or modify the charter To this corporation Congress made a loan of $27,000,000, and a donation of lands of a value probably equal to the loan.

The statute-books of the States are full of acts directing the law officers to proceed against corporations, such as banks, insurance companies, and others, in order to have a decree declaring their charters forfeited.   Special statutes are also common, ordering suits against such corporations when they have become insolvent, to wind up their business affairs, and to distribute their assets, and prescribing with minuteness the course of procedure which shall be followed and the court in which the suit shall be brought.

This court said, in the case of *The Bank of Columbia* v. *Okely* (4 Wheat. 235), in speaking of a summary proceeding given by the charter of that bank for the collection of its debts : " It is the remedy, and not the right, and as such we have no doubt

of its being subject to the will of Congress. The forms of administering justice, and the duties and powers of courts as incident to the exercise of a branch of sovereign power, must ever be subject to legislative will, and the power over them is unalienable, so as to bind subsequent legislatures." And in *oung* v. *The Bank of Alexandria* (4 Cranch, 397), Mr. Chief *ustice* Marshall says: "There is a difference between those *ights* on which the validity of the transactions of the corporation depends, which must adhere to those transactions everywhere, and those peculiar remedies which may be bestowed on it. The first are of general obligation; the last, from their nature, can only be exercised in those courts which the power making the grant can regulate." See also *The Commonwealth* v. *The Delaware & Hudson Canal Co. et al.*, 43 Pa. St. 227; *State of Maryland* v. *Northern Central Railroad Co.*, 18 Md. '93; *Colby* v. *Dennis*, 36 Me. 1; *Gowan* v. *Penobscot Railroad 'o.*, 44 id. 140.

Statutes of this character, if not so common as to be called inary legislation, are yet frequent enough to justify us in *ying* that they are well-recognized acts of legislative power niformly sustained by the courts.

It may be said, and probably with truth, that such statutes, *when* they have been held to be valid by the courts, do not nfringe the substantial rights of property or of contract of the parties affected, but are intended to supply defects of power in the courts, or to give them improved methods of procedure in dealing with existing rights.

This leads to an inquiry indispensable to a sound decision of the case before us; namely, does this statute, by its true construction, do any thing more than this?

We might rest this branch of the case upon the concession of counsel for appellants, made both in their brief and in the oral argument, but we proceed to examine the proposition for ourselves.

The first suggestion of the legal mind on this inquiry is, that it will not be presumed, unless the language of the statute imperatively requires it, that Congress, by a retrospective law, intended to create new rights in one party to the suit at the expense, or by an invasion of the rights, of other parties; or,

where no right of action founded on past transactions existed, that Congress intended to create it.

The United States was to be sole complainant in a suit in equity, and though there may be other defendants, the Union Pacific Railroad Company is the only one named in the act. The relief to be granted is the collection and payment of moneys and the restoration of property, or its value, " either to said railroad corporation or to the United States, whichever shall in equity be entitled thereto." The decree, therefore, can only be made on the ground of some relief to which the United States or the company is entitled by the general principles of equity jurisprudence. It is no objection to granting such relief that the company is a defendant, for by the flexibility of chancery practice a person whose interests in the subject of litigation are on the same side with the complainant may be made a defendant. The corporation could also in such a suit file a cross-bill against the complainant, and, by virtue of this statute, against any co-defendant of whom it could rightfully claim the relief which the statute authorizes.

But whatever be the relief asked, it could only, by the express terms of the act, be granted to that party who was in equity thereunto entitled. It is very plain that there was here no new right established. No new cause of equitable relief. No new rule for determining what were the rights of the parties. That was to be decided by the principles of equity ; not new principles of equity, but the existing principles of equitable jurisprudence.

But the statute very specifically defines the matters which may be embraced in this suit as foundations for relief, and classifies them under a very few heads, by declaring who besides the corporation may be sued. They are persons who have received, —

1. Capital stock of the company without paying for it in money ;

2. Other property of the company unlawfully and contrary to equity ;

3. As profits or proceeds of contracts for construction, money or other property which ought in equity to belong to the corporation ; or,

4. Persons who have wrongfully received from the United States bonds, moneys, or lands which ought in equity to be accounted for, or paid to it or to the company.

There is in this description of the class of persons who may be sued an implied condition that they are already subject to be sued for causes which render them equitably liable. The relief to be granted is also such as to equity belongs.

We are of opinion, therefore, that the act in question was intended not to change the substantial rights of the parties to the suit which it authorized, but to provide a specific method of procedure, which, by removing restrictions on the jurisdiction, process, and pleading in ordinary cases, would give a larger scope for the action of the court, and a more economical and efficient remedy than before existed; and that it is a valid and constitutional exercise of legislative power.

If in passing on its constitutional validity we have given the subject much consideration, it will be seen that we have at the same time been compelled to give a construction to its language which will go far to enable us to decide whether it authorized the bill that was filed; for we are of opinion that nothing other than what is found in the act, by express language or by fair implication, can be introduced into this suit as a foundation for the action of the court.

The Attorney-General is peremptorily ordered to bring the proceeding. The filing of the bill and its subject-matter are both removed from the domain of discretion. For the purposes of this suit, the court wherein it is brought is vested with powers and aided by modes of procedure which it can apply to no other. Parties are subjected to a jurisdiction by process to which the same court cannot subject them in any other suit, and they are required to litigate their rights in a suit common to them and others with whom they could not be joined under the rules governing such matter in any other case.

We are bound, therefore, to presume that Congress did not intend that this special remedy should include any thing beyond the matters which we have seen were so carefully and so specifically mentioned as grounds of relief.

Other provisions of the act show that Congress had, or believed that it had, other grievances against this company for

which other remedies are furnished. Any director or officer who violates certain provisions is to be punished criminally. By *mandamus* in the proper court, but not in this suit, the company is to be compelled to operate its road as required by law. The second section directs the Secretary of the Treasury to withhold payment for transportation for the United States until what is due for interest paid shall be satisfied, and the matter, if disputed, is to be settled by suit brought by the company in the Court of Claims.

This consideration makes it clear that any bill brought by the Attorney-General under the fourth section of the act of 1873 must be limited by the provisions of that act, both as to the grievances on which it counts and the relief which it seeks.

With these views of the statute under which this bill is brought, and by which its sufficiency on demurrer must be tested, we approach the examination of the bill itself.

It consists of forty-seven pages of printed matter, divided into forty-eight separate paragraphs, each of which undertakes to set forth a distinct ground of relief, or points out the relief which is sought.

It will, therefore, be impossible to give in this opinion the results of the separate examination of each of these paragraphs; nor is this at all necessary. A consideration of the principal grounds of relief, grouped as they can easily be under a few heads, will indicate the views which we believe to be sufficient to decide the whole.

We will consider together the allegations of the bill against the Wyoming Coal Company, the Credit Mobilier Company, the Pullman Palace Car Company, and the three construction contracts of H. M. Hoxie, Oakes Ames, and James W. Davis. These are by far the most important as regards the sum involved as well as the principles which must decide the case.

The substance of the charge is, that the board of directors of the railroad company made contracts for building the road, and for running the Pullman cars on it, and for mining its coal lands and purchasing the coal so mined, which were a fraud upon the company; that these contracts allowed exorbitant prices for work done and material furnished; that otherwise·

they were very advantageous to the other contracting parties and injurious to the company; that in all of them the directors, or a controlling majority of them, were interested adversely to the company; that in fact they were, in the name of the company, making contracts with themselves as the other party. In short, it may be taken for granted that if these allegations are true, as they must be held to be on demurrer, frauds more unmitigated than those set forth in this bill were never perpetrated on a helpless corporation by its managing directors.

That these frauds are such as a court of equity would relieve against in a proper case, may be seen in the opinion of the Circuit Court for the Nebraska district, in a suit growing out of the Wyoming Coal Company's contract. *Wardell* v. *The Union Pacific Railroad Co.*, 4 Dill. 330.

The first inquiry arising on these facts is, What relief can be given, and who is entitled to it?

The obvious reply to the first branch of the question is, that the parties who made this contract and received the pecuniary benefit of it can at law be made responsible in damages, or held in equity to compensation for the loss suffered. There would be no difficulty in adjudging in a proper suit that such contracts were void, and then ordering an accounting, on the basis of a fair compensation for what had been done in the way of construction, building, opening mines, furnishing coal, &c., and what had been received for such work and materials. The difficulty is, to whom shall this money be paid when recovered, and can it be recovered in this suit? If the railroad company, falling into purer hands, had brought such a suit, the bill might be sustained.

But the company is not the complainant here. It seeks no relief for these wrongs. It may have been the design of the law to give the corporation an opportunity by a cross-bill to obtain relief against the other defendants, who are charged with these frauds. Such a bill, if not strictly within the rule of equity procedure, which only allows a defendant to file a cross-bill against a complainant, might be sustained under the provisions of this statute. But the company files no such bill. It desires no such relief. On the contrary, it resists by demurrer any further proceeding in the matter. Can it be compelled in

this mode to prosecute such a suit ?   So long as it exists in the possession and unrestrained exercise of all its corporate powers, its board of directors, unless under judicial prohibition or compulsion, is vested with the sole authority to decide whether it will assert its right of action for a supposed injury, or will condone it.

The circumstances of the alleged fraud, the probability of success in the suit, the extent of the injury, the amount which may be recovered, the expense of the proceeding, and the danger of injury to the company itself, are all matters which address themselves to them as grounds for the exercise of the discretion of the directors.   They have decided to have nothing to do with it.   How, then, can a decree be rendered in their favor, or relief be given them which is not asked?   With what hope of advantage can the court enter upon the inquiry touching the frauds alleged, and the amount of the injury sustained, when the party aggrieved refuses to proceed ?

On the other hand, if the court does proceed, shall the decrees, if rendered against the defendants, be in favor of the company?   If so, what good results would follow?   Since the company resists any decree in its favor now, it would probably enter satisfaction or releases of the decrees as fast as they are rendered.   If it did not do this, how would the moneys, if collected and paid into its treasury, be applied ?   It is alleged to be insolvent and in debt, but except the claim of the government, which will be presently considered, there is no allegation showing to what use the court can decree the application of these moneys.   They must, therefore, go into the treasury of the company, to become subject to the control of its directors, who are now resisting this action.   Not only this, but it is obvious that the amount recovered would come mainly out of the same men who now as directors or as stockholders would control the fund, and would probably order its redistribution to the parties who paid it, or give receipts or releases in advance.

The truth is, that the persons who were actually defrauded by these transactions, if any such there be, were the few *bona fide* stockholders who took no part in them, and had no interest in the fraudulent contracts.   But it is not alleged that

there are such.  If there be, they are not made parties to this bill, nor does it provide any relief for them.  Yet a moment's consideration will show that they alone (to say nothing of the complainant for the present) suffered any legal injury, or are entitled to any relief.  As to the directors and stockholders who took part in these fraudulent contracts, they are *participes criminis*, and can have no relief.  This class probably included nine-tenths in value of the shareholders.  It is against all the principles of jurisprudence, whether at law or in equity, to permit them to litigate this fraud among themselves.  If the innocent stockholders are not parties here, we have already seen that, with the power of the directors over the money recovered, they would get no relief by the suit.

The statute, however, did not permit them to be made parties.  Their interest is not the same as that of the company.  The statute provides only for the collection and payments of money, or the restoration of property, or its value, to the railroad company, or to the United States, as either of them may be in equity held entitled thereto.  This does not embrace what a defrauded stockholder may be entitled to in his individual right.

We are of opinion, therefore, that no decree can be rendered in favor of the railroad company on account of these transactions, or for the value of the stock not paid for by those who received it.  Although issuing it without payment may have been in violation of law, and an implied contract may exist on which the company could compel payment, the United States cannot in this suit recover it, and the company refuses to assert its right thereto.

The same principle applies to the arrangements made by the railroad company with the Atlantic and Pacific Telegraph Company, and with the Omaha Bridge Company, which are here assailed.  These are existing contracts under which the business of the principal corporation with the others is conducted, and with which it is satisfied.  It asks no rescission, and is content to comply with them.  It is not within the power of the court to annul them, or to make new ones for the parties.

No decree can therefore be rendered on this bill in favor of

the Union Pacific Railroad Company, because it is not the complainant, but a defendant, and, asking no affirmative relief or any other, it resists being brought into this suit, and refuses to plead in it any further than compelled by the court.

If there is any relief to which the United States is entitled against the company, the latter, being a defendant, must remain and answer to the claim.   But it is conformable to the principles neither of the common law nor of equity to compel it to prosecute a suit as complainant which it disapproves, or to establish a claim which it denies, or take a decree where it asserts nothing to be due.

We must now inquire whether the bill makes a case in which the United States, the complainant, is entitled under the terms of the statute to relief.

The United States is not, and never has been, a stockholder in this company.   It is a creditor.

The government sustains two distinct relations to the railroad company, and, in considering her rights under this statute, it is important to keep them separate.   The company is organized under, and owes its corporate existence to, an act of Congress.   The government has all the rights which belong to any other government as a sovereign and legislative power over this creation of that power.   That this power should not be too much crippled by the doctrine that a charter is a contract, the eighteenth section declares that Congress may at any time, having due regard for the rights of the companies named therein, add to, alter, amend, or repeal the act.   The power of Congress, therefore, in its sovereign and legislative capacity over this corporation is very great.

The government, however, holds another very important relation, namely, that of contract.   It has loaned to the company $27,000,000, and granted to it on certain terms many million acres of land.   The government is paying all the time the semi-annual interest on its own bonds, loaned to the company.   The company is bound by contract to pay them, principal and interest, at their maturity.   The government by the contract has a lien on the road and its appurtenances to secure this payment.   The company is also bound by the contract to perform for the government all the transportation and tele-

graphing that may be required of it, and to keep its road and line always in order and readiness to render these services. It may have other contract obligations to the government not here mentioned, but these are all that are important to our inquiry. The government has delivered its bonds to the company. The company has built the road, owns it, and operates it. Does the bill allege any thing which, growing out of this contract, entitles the United States to relief?

One of its allegations is that there is due to the United States and unpaid, on account of interest on the bonds, the sum of $6,198,700, and that the balance of interest for which the company is liable is rapidly accumulating. It was filed in May, 1873, and this court, at its October Term, 1875, decided, in *United States* v. *Union Pacific Railroad Co.* (91 U. S. 72), that the company was not bound to pay this interest until the bonds mature, except so far as the act made in that regard two special provisions. One was that half the compensation for transportation performed for the United States should, as provided by the subsequent amended charter of 1864, be withheld by the government for that purpose; the other was that after the completion of the road five per cent of its net earnings were to be applied annually to extinguish the debt to the United States.

The second section of the act of 1873, as we have seen, provides for the first of these cases, and as to the other, the government has brought suits, which are now ripe for decision in this court.

There is, therefore, no ground for relief on account of money due by the company to the United States.

It is said that the latter, as a creditor whose lien is endangered by the extravagance of the company, and the misappropriation of its means, has the right to come into equity for preventive relief to secure the collection of the sums of which the company has been defrauded.

The government made its contract and bargained for its security. It had a first lien on the road by the original act of incorporation, which would have made its loan safe in any event. But in its anxiety to secure the rapid prosecution of the work, — an end more important to it than to any one else,

and still more important to the people whom it represented, postponed this lien to another mortgage, that the means mig be raised to complete the road. It has the second lien, how ever, and the right to appropriate one-half of the price it annually pays for the use of the road, — a very large sum, — and five per cent of the net earnings of the road, which may become much larger, to the extinction of this debt. It is not wholly unreasonable to suggest that the amount which the company may be compelled to pay annually, under these two provisions, will be sufficient as a sinking fund to pay the entire debt, principal and interest, before it falls due.

It is difficult to see any right which as a creditor the government has to interfere between the corporation and those with whom it deals. It has been careful to protect its interests in making the contract, and it has the right which that contract gives. What more can it ask? It is true that there is a allegation of insolvency. But in what that insolvency consists is not clearly shown. It has a floating debt. What railroad company has not? It is said it does not pay the interest on its debt to the United States. We have shown that it owes the United States no money that is due. There is no allegation that it does not pay the interest on all its own funded debt. The allegation as it is would be wholly insufficient to place the corporation in bankruptcy, even if that was not forbidden by the act under which this bill is drawn. The facts stated are utterly insufficient to support a creditor's bill by the United States. That requires a judgment at law, an execution issued, and a return of *nulla bona.* Here there is no judgment, no money due, and no sufficient allegation of insolvency.

We are unable, therefore, to see any relief to which under this bill the United States, on account of its contract relations with the company, would be entitled in a court of equity.

If we look at the statute this is still clearer. The moneys due for unpaid stock, or for property of the company unlawfully received, or as profits in fraudulent contracts for construction, are all described in the act as belonging to the corporation, and to be restored to it. Those who may have wrongfully and unlawfully received from the United States bonds, moneys, or lands which ought in equity to be accounted for and paid to it or to

ompany, may be compelled to pay the moneys or restore the operty to the party, which shall in equity be entitled thereto.

But, in this connection, no one but the company has received property, lands, or moneys from the United States. There is no allegation that the moneys were not used to build the road. If there was, there is nothing now due, and the company is performing all its obligations to the government under the contract.

The bill establishes no right in the government, under this or any other clause of the act, to recover in its own right any property or money from the company.

In its sovereign or legislative relation to the company, the United States has powers the extent of which it is unnecessary to define in this case. The two sections of the act, under one of which this suit was instituted, are instances of the exercise of these powers, and they affect the interest of the company in important particulars. Congress might also have directed the Attorney-General, either as part of this proceeding or as an independent one, to ask the court to declare the franchises of the company forfeited. It might have ordered a bill to inquire if the company was insolvent, and if so, to wind up its affairs and distribute its assets. In short, there are many modes in which the legislature could have called into operation all the judicial powers known to the law. But it has not done so, and that is the constantly recurring answer to this bill. It provided in the statute for a mode of securing a full inquiry into the affairs of the company, by enacting that the Secretary of the Treasury should have free access to all its books and correspondence, — a mode of obtaining information far more effective than a bill of discovery. The statute, therefore, did not authorize a bill of discovery. Not wanting the company declared bankrupt and closed out by a decree of the court, Congress enacted that it should not be subject to the bankrupt law, as other corporations were, but should continue to exercise its franchises and perform its duties, and that it might be compelled to do this by a writ of *mandamus* from the proper court. It limited the relief to be granted under this act, therefore, both by the terms in which it was granted and by other provisions, to the recovery of a moneyed decree, or a restoration

of specific property to which the United States or the company was by law entitled.

It is useless, therefore, to inquire what might have been done by some other legislation, or what, independently of legislation, are the rights of the government; for we can only act on such as are recognized by the act under which the Circuit Court proceeded.

This brings us to the consideration of the last ground of relief which we propose to notice, and which, with the alleged right to a decree in favor of the company against the individuals and corporations who have defrauded it, is most earnestly insisted on here.

The proposition is that the United States, as the grantor of the franchises of the company, the author of its charter, and the donor of lands, rights, and privileges of immense value, and as *parens patriæ*, is a trustee, invested with power to enforce the proper use of the property and franchises granted for the benefit of the public.

The *legislative* power of Congress over this subject has already been considered, and need not be further alluded to. The trust *here* relied on is one which is supposed to grow out of the relations of the corporation to the government, which, without any aid from legislation, are cognizable in the ordinary courts of equity.

It must be confessed that, with every desire to find some clear and well-defined statement of the foundation for relief under this head of jurisdiction, and after a very careful examination of the authorities cited, the nature of this claim of right remains exceedingly vague. Nearly all the cases — we may almost venture to say all of them — fall under two heads : —

1. Where municipal, charitable, religious, or eleemosynary corporations, public in their character, had abused their franchises, perverted the purpose of their organization, or misappropriated their funds, and as they, from the nature of their corporate functions, were more or less under government supervision, the Attorney-General proceeded against them to obtain correction of the abuse ; or,

2. Where private corporations, chartered for definite and limited purposes, had exceeded their powers, and were restrained

or enjoined in the same manner from the further violation of the limitation to which their powers were subject.

The doctrine in this respect is well condensed in the opinion in *The People* v. *Ingersoll*, recently decided by the Court of Appeals of New York.  58 N. Y. 1.  " If," says the court, " the property of a corporation be illegally interfered with by corporation officers and agents or others, the remedy is by action at the suit of the corporation, and not of the Attorney-General. Decisions are cited from the reports of this country and of this State, entitled to consideration and respect, affirming to some extent the doctrine of the English courts, and applying it to like cases as they have arisen here.  But in none has the doctrine been extended beyond the principles of the English cases ; and, aside from the jurisdiction of courts of equity over trusts of property for public uses and over the trustees, either corporate or official, *the courts have only interfered at the instance of the Attorney-General to prevent and prohibit some official wrong by municipal corporations or public officers, and the exercise of usurped or the abuse of actual powers.*" p. 16.

To bring the present case within the rule governing the exercise of the equity powers of the court, it is strongly urged that the company belongs to the class first described.

The duties imposed upon it by the law of its creation, the loan of money and the donation of lands made to it by the United States, its obligation to carry for the government, and the great purpose of Congress in opening a highway for public use and the postal service between the widely separated States of the Union, are relied on as establishing this proposition.

But in answer to this it must be said that, after all, it is but a railroad company, with the ordinary powers of such corporations.  Under its contract with the government, the latter has taken good care of itself; and its rights may be judicially enforced without the aid of this trust relation.  They may be aided by the general legislative powers of Congress, and by those reserved in the charter, which we have specifically quoted.

The statute which conferred the benefits on this company, the loan of money, the grant of lands, and the right of way, did the same for other corporations already in existence under State or territorial charters.  Has the United States the right

to assert a trust in the Federal government which would authorize a suit like this by the Attorney-General against the Kansas Pacific Railway Company, the Central Pacific Railroad Company, and other companies in a similar position?

If the United States is a trustee, there must be *cestuis que trust*. There cannot be the one without the other, and the trustee cannot be a trustee for himself alone. A trust does not exist when the legal right and the use are in the same party, and there are no ulterior trusts.

Who are the *cestuis que trust* for whose benefit this suit is brought? If they be the defrauded stockholders, we have already shown that they are capable of asserting their own rights; that no provision is made for securing them in this suit should it be successful, and that the statute indicates no such purpose.

If the trust concerned relates to the rights of the public in the use of the road, no wrong is alleged capable of redress in this suit, or which requires such a suit for redress.

*Railroad Company* v. *Peniston* (18 Wall. 5) shows that the company is not a mere creature of the United States, but that while it owes duties to the government, the performance of which may, in a proper case, be enforced, it is still a private corporation, the same as other railroad companies, and, like them, subject to the laws of taxation and the other laws of the States in which the road lies, so far as they do not destroy its usefulness as an instrument for government purposes.

We are not prepared to say that there are no trusts which the United States may not enforce in a court of equity against this company. When such a trust is shown, it will be time enough to recognize it. But we are of opinion that there is none set forth in this bill which, under the statute authorizing the present suit, can be enforced in the Circuit Court.

There are many matters alleged in the bill in this case, and many points ably presented in argument, which have received our careful attention, but of which we can take no special notice in this opinion. We have devoted so much space to the more important matters, that we can only say that, under the view which we take of the scope of the enabling statute, they furnish no ground for relief in this suit.

The liberal manner in which the government has aided this company in money and lands is much urged upon us as a reason why the rights of the United States should be liberally construed. This matter is fully considered in the opinion of the court already cited, in *United States* v. *Union Pacific Railroad Co. (supra)*, in which it is shown that it was a wise liberality for which the government has received all the advantages for which it bargained, and more than it expected. In the feeble infancy of this child of its creation, when its life and usefulness were very uncertain, the government, fully alive to its importance, did all that it could to strengthen, support, and sustain it. Since it has grown to a vigorous manhood, it may not have displayed the gratitude which so much care called for. If this be so, it is but another instance of the absence of human affections which is said to characterize all corporations. It must, however, be admitted that it has fulfilled the purpose of its creation and realized the hopes which were then cherished, and that the government has found it a useful agent, enabling it to save vast sums of money in the transportation of troops, mails, and supplies, and in the use of the telegraph.

A court of justice is called on to inquire not into the balance of benefits and favors on each side of this controversy, but into the rights of the parties as established by law, as found in their contracts, as recognized by the settled principles of equity, and to decide accordingly. Governed by this rule, and by the intention of the legislature in passing the act under which this suit is brought, we concur with the Circuit Court in holding that no case for relief is made by the bill.

*Decree affirmed.*

MR. JUSTICE SWAYNE, with whom concurred MR. JUSTICE HARLAN, dissenting.

I concur in the opinion, so far as it relates to the constitutional validity of the act of Congress which lies at the foundation of the case. In the residue I cannot concur.