Hughes, District Judge.
The case in chief was decided by this court on the 14th of March last.[1] This petition had been filed on the 25th of February preceding. Upon the facts shown by the record, this court awarded the sum of $12,500 to the Brixham for salvage services rendered to the steamship Chatfield, of which $5,500 was intended in remuneration for expenses and damages incurred by the Brixham, and $7,000 as bounty for a meritorious salvage service. This sum of $7,000 is now in the registry of the court. The service was rendered by the Brixham to the Chatfield on the 27th of October, 1891, in taking hold of her when well out to sea, with a broken propeller, in a heavy gale, towing her the greater part of the day to an anchorage 40 miles southeastwardly from Cape Henry, and lying by her all night of the 27th, until the next morning, when the wind had abated, but the sea was still running high. The service of the Brixham to the Chatfield was completed on the morning of the 28th, and was never resumed. For this service the award of salvage which has been described was made by this court. On the morning of the 28th, Capt. McFee, master of the Chatfield, deputed Sheldrake, mas.ter of the Brixham, to come into Norfolk for the purpose of engaging a strong tug to go out for the Chatfield, and to give aid in towing her into port. Capt. Sheldrake came to Norfolk with the Brixham, in pursuance of these instructions of Capt. McFee, and engaged the Rescue, a strong *496 tug, owned by the Merritt Wrecking Organization, to go to the assistance of the Chatfield. What was said between Capt. Sheldrake, agent of the Chatfield, and Thadeus Gray, agent of the Merritts, in Norfolk, in the negotiation which secured the Rescue’s services, is hereafter detailed.
The petition of the Merritts, now to be considered and passed upon, claims, on the basis of that negotiation, one half of the salvage bounty which should be received by the Brixham; that is to say, as matters have turned out, one half of the $7,000 now in the registry of this court. As a matter of fact, the expedition of the Rescue in search of the Chat-field was fruitless. An hour or two after Capt. Sheldrake left the Chat-field off Cape Henry, on the morning of the 28th of October, another steamship, coming in sight, was signaled by the Chatfield, took her in tow, and brought her into Hampton Roads, where they arrived before •the Rescue and Brixham had set out from Norfolk, on the night of the 28th, in search of the Chatfield; and the Rescue, in point of fact, rendered no beneficial service to the Chatfield whatever, either in the nature of salvage or of simple towing. As already stated, this petition is brought to subject half of the salvage bounty, which, since its filing, has been awarded to the Brixham, to the payment of the Merritts for the intended service of the Rescue to the Chatfield, as described; which half is claimed under an alleged agreement between Gray, agent of the Rescue, and Sheldrake,'agent of the Chatfield, on the night of the 28th, whatever that agreement was. On that subject the testimony is substantially as follows: Capt. Sheldrake came to Norfolk on the Brixham, as instructed by the master of the Chatfield. He arrived in port on the afternoon of the 28th, and at once sought the office of William Lamb, shipping merchant, who had acted on a previous occasion as agent of the Brixham. Col. Lamb being absent, Capt. Sheldrake requested his clerk or cashier to advise him in procuring a tug of the kind he was in search of.. This clerk’s name is Hugo Arnal. Through him, Thadeus Gray, agent of the Merritts, was sent for, with whom, after some conversation, it was agreed that the tug Rescue should forthwith set out, in company with the Brixham, to the assistance of the Chatfield. The two steamers did' accordingly set out at once, and reached the point at which the Brixham had left the Chatfield early on the morning of the 29th. As a matter of course, they failed to find her; the Chatfield, as before stated,, having been brought into Hampton Roads on the 28th by another vessel. The two steamers, therefore, had nothing else to do, after a day’s useless search, but to return to Norfolk without the Chatfield.
As to the agreement that was made between Sheldrake and Gray, the following, somewhat abridged, is what the latter says on the subject:
“A message came to me from Col. Lamb’s office that Captain Sheldrake of the Brixham wanted to employ a tug to go to the assistance of a steamer outside, forty miles off the capes of Virginia. On going to Col. Lamb’s office, Captain Sheldrake stated that, through authority of the captain of the steamer outside, he came in to get a tug to aid him in towing her in, and he asked me what I would go for. I couldn’t give him any reply to that, and I asked him then what he would give. He made an offer of half of what he would get for *497 towing herin from the position whereshe was. ‘ Well,’ I says to him, * Captain Sheldrake, a vessel lying out there anchored, though you may think she will stay there until you get back, it is very unlikely she will do so; for some coasting vessel will come along and pick her up; ’ and I didn’t make him any answer for some time, and discussed the situation with him, and was about to take my leave, and he then spoke up, and, said he, ‘Well, I’ll throw in the twelve hours’ towing that I have done.’ Then I said, ‘ In consideration of that, I will do it.’ Then I started out of the door. We met Captain Nelson in the hall, and I remarked to Captain Sheldrake that he was to go in full halves in all that he got, and called Captain Nelson’s attention to it, and Captain Sheldrake says, ‘ Yes; in full halves of all we get.’”
In regard to this interview, Capt. Sheldrake says:
“We there and then made the agreement that they would send a tug with me to the assistance of the Chatfield; that they should receive half of what we might earn. It was distinctly stated that what I had already earned was mine. I also informed them that I was sent there, and was acting solely and entirely as the agent for the captain of the Chatfield, and entirely under his instructions. Under these circumstances, they accompanied me, and we went in search of the Chatfield, but didn’t find her.”
Capt. Nelson, who went out on the Rescue, says, in regard to the occurrence in the hall of Col. Lamb’s office in his presence, that “ it was stated by Gray that the Merritts were to have full half of what Sheldrake was to get, and Sheldrake replied ‘full half;”’ but Capt. Nelson does not say, and did not seem to know, what it was that was to be halved; whether it was what was to be earned by their joint services, or what had already been earned by the Brixham alone, added to what should be earned jointly.
Two witnesses, who should have been indifferent between the parties to the controversy, testify in the case. Baker, in his testimony, relates what he heard in one room of a conversation between Sheldrake and Gray in another. He is so inaccurate in what he says of matters in that conversation known to the court as to render what he testifies as to the compensation which the Rescue was to receive unreliable in point of accuracy. .The relation of Hugo Arnal to the case, and the partisanship manifested by him in behalf of the petitioners, and in prejudice of the party who had gone to him as an adviser and friend, divest his testimony of any special weight with the court.
The issue stands as between Gray’s understanding and Sheldrake’s; as between Gray’s claim that his employers were to receive half of what the Brixham should receive for its whole service to the Chatfield, and Sheldrake’s averment that it was to be half of what they should jointly earn in the service which they were about to undertake. It is an issue upon the credibility of Gray and Sheldrake. The extraordinary reason given by Gray for insisting upon the extraordinary bargain which he claims to have made with Sheldrake makes it incredible that Sheldrake could really have intended to enter into such a bargain. Gray says that, because it was feared the Chatfield would be brought in by some coasting vessel, it was for that reason that Sheldrake threw in half of the *498 salvage which he had already earned, to pay the Rescue for doing what was likely to be nothing at all; that is to say, because the Rescue was* not likely to render any service to the Chatfield at all, therefore Sheldrake agreed to pay more than the most beneficial salvage service would be worth.
■ In the case in chief, Sheldrake v. The Chatfield, 52 Fed. Rep. 479. Capt. Sheldrake impressed the court, by what he was shown by the evidence to have done in saving the Chatfield, and by his own testimony under severe cross-examination, as a skillful mariner, a truthful witness,, and a sensible, practical man of business. The court knows nothing of Gray, except by his testimony now under review, in connection with a contract he claims to have secured, extraordinary in its terms, paradoxical in respect to the reason on which it is claimed to have been based,, and unprecedented in its character. On an issue of fact between these-two men touching such a contract, I am not disposed to credit Gray and to discredit Sheldrake. As it requires two to make a bargain, it is plain, to me that the minds of these two contracting parties did not meet in, common agreement, and that there was really no bargain made that was mutually assented to.
Another very singular feature in this claim is that it is asserted-against the Brixham, although the service was for the benefit of the Chat-field. Whatever agreement was entered into on the evening of the 28tb of October was made by Gray, the agent of the Rescue, with Sheldrake,, the agent of the Chatfield, for assistance to be rendered to the Chatfield? in the nature of salvage. The contract of the Rescue was made with the Chatfield, at the request of the Chatfield, for the benefit of the Chat-field, and impliedly at the charge of the Chatfield. It constituted a lien in rem in favor of the Rescue against the Chatfield, and entitled-the owners of the Rescue to come into this court to assert that lie» against the Chatfield, either by original libel or by petition under the-forty-third rule in admiralty. The proof is conclusive that this was a? valid maritime claim against the Chatfield. Grajos testimony, already-quoted, is explicit to the effect that Sheldrake was acting as agent of the Chatfield, charged with the mission to procure assistance for that steamship, and that Gray negotiated with him in that character. Hugo Arnal says that Gray thoroughly understood that it was at the-instance of the captain of the Chatfield, and by his express order, that Sheldrake had come to Norfolk to get further assistance for the Chat-field. The petition of the Merritts, now under consideration, alleges-that the master of the Chatfield had directed Sheldrake to “depart for Norfolk, and employ a tug, and return to his relief, and had repeated' his request; and that, in performance of this request, the Brixham had" left the Chatfield, steamed to Norfolk, and immediately employed petitioners to go to the assistance of the Chatfield.” It was not only known to Gray and Arnal, but to all bystanders, that the character in. which Sheldrake was acting was that of the Chatfield’s agent. It follows-that whatever compensation was stipulated to be paid for the service which the Rescue was to render was a compensation payable by the *499 Chatfield. Upon the facts thus presented by the record, a variety of questions arise for consideration.
This proceeding is anomalous in seeking to enforce against one vessel a claim for service rendered to another vessel. It is not shown how the Brixham could be, or was expected to be, benefited by the service which was to be rendered to the Chatfield. That is left wholly to inference. The consideration for which the Brixham was to pay for such a service is not shown in the evidence. On the pleadings and proofs, if there is any agreement shown to have been entered into by the Brixham to pay for services to the Chatfield, it is nudum pactum. Nor is there any evidence that the credit in the transaction was given by the agent of the petitioners to the Brixham. That ship was hardly mentioned at all in the conference between Gray and Sheldrake. If credit was given to other than the Chatfield, it was to the salvage money which the Brixham was believed to have earned on the day and night of the 27th of October, which was yet but a chose in action. If given on the faith of this chose in action, for which the Brixham afterwards filed a libel in the suit in chief, it was not given to the ship herself, and, as against the Brixham, is not a maritime claim, enforceable in this court. If Sheldrake had acted, in his negotiation with Gray, as master of the Brixham, and not as agent of the Chatfield, it might have been competent for him to have made a contract for such a service as that under consideration on the faith of his own ship; in which case an express stipulation to that effect would have been necessary. But in his negotiation with Gray his character as agent of the Chatfield was constantly asserted and unqualifiedly recognized. Under these circumstances, is it competent for this court to imply an obligation upon the Brixham, and to ignore altogether, as the petitioners have done, the obligation of the Chatfield to remunerate the Rescue for whatever is equitably due for the trip in search of her, for which the Rescue was employed by Sheldrake?
But the most important question in this case is whether a proceeding like this is within the cognizance of the admiralty court. To be so it must fall within the purview either of rule 19 or 43 of the rules in admiralty. The first provides that “in all suits for salvage the suit may be in rem against the property saved, or the proceeds thereof; or in personam against the party at whose request and for whose benefit the salvage service has been performed.” In the case of the Rescue no salvage service was rendered,- and therefore no claim for salvage can be entertained. But if it could be, this is not a proceeding in rem against the Chatfield, or the proceeds of the Chatfield, nor is it a proceeding in personam against Sheldrake or McFee, at whose request the service was rendered. The proceeding of these petitioners, therefore, is not within the purview of rule 19. Rule 43 provides that “any person having an interest in any proceeds in the registry of the court shall have a right, by petition and summary proceeding, to intervene pro interesse suo for a delivery thereof to him.” This rule was plainly intended to allow persons, like mortgagees, part owners, or other persons having an interest in a vessel libeled in admiralty, to come into the main suit, and get the *500 remnants of the proceeds left after satisfying the libelant. Under this rule, it is not competent for one having a mere personal claim against the owner of the vessel libeled to come in and liquidate such claim. In order that a third person may come in by petition, he must have an interest of some sort in the ship libeled, or in the proceeds arising from her sale in the registry of the court. Claims of any third person, not against the ship, but only against her owner, must be the subject of an independent suit at common law, with the privilege of jury trial, if it be not within the cognizance of admiralty, or of an independent proceeding in personam in admiralty, if it be a claim over which admiralty has cognizance. The petition under consideration is not brought against the ship that was libeled in the chief suit, nor against its owners, nor against any proceeds of the Chatfield in the registry of the court. It is not brought on the maritime contract which petitioners had with the Chat-field. It is brought against a fund in court that has been decreed in favor of the Brixham, the libelant in chief, upon an allegation that the Brixham owes the petitioners money which she had contracted to pay them.
It was never contemplated by the framers of rule 43 to allow any person asserting no interest in a ship libeled in an admiralty court to file a petition claiming an interest in what the court may decree in favor of the libelant, and to have his claim litigated by the summary method of admiralty between himself and the libelant. If this petition of the Merritts could be entertained, then, if John Doe should have a claim against them, and should file a petition to be paid what the court should decree to the Merritts, it would be competent for the court to entertain that petition also; and then, if Richard Roe should have a claim against John Doe, aforesaid, he could file his petition, claiming to be paid out of what the court should decree to Doe; and so on ad infinitum; and one admiralty suit would be made the mother of a brood of petitions, without number and without limit, in endless catenation. If the first petition could be entertained, then, on the same principle, all would have to be entertained. The absurdity of such a principle is apparent. Under rule 43, none can file petitions except such as have an interest in the vessel libeled, or in such surplus proceeds of the sale of her in the registry of the court as shall remain after satisfying the original libelant. If that libelant' himself owes debts, it is not competent for the admiralty court to adjudicate upon them between him and his creditors. Such claims must be litigated in original and independent suits, either at common law or in admiralty, according as the claims are civil or maritime.
On all the grounds suggested, this petition must be dismissed, with costs, but chiefly on the ground that the petitioners cannot litigate in this proceeding in this court any claim they may have against any other debtor than the ship Chatfield. I will so decree.

 52 Fed. Rep. 479.