**INDUSTRIA E. COMERCIO DE MINERIOS, S.A., Libellant,**

v.

**NOVA GENUESIS SOCIETA PER AZIONI PER L'INDUSTRIA ET IL COMMERCIO MARITIMO, Respondent.**

No. 7933.

United States District Court
E. D. Virginia,
Norfolk Division.
April 15, 1959.

Michael B. Wagenheim, Norfolk, Va., Hill, Rivkins, Middleton, Louis & Warburton (George B. Warburton), New York City, for libellant.

Seawell, McCoy, Winston & Dalton (Leon T. Seawell, Jr.), Norfolk, Va., Ober, Williams, Grimes & Stinson (William A. Grimes), Baltimore, Md., for respondent.

John M. Hollis, U. S. Atty., Norfolk, Va., for the United States.

WALTER E. HOFFMAN, District Judge.

In the early part of 1953 the United States of America, acting by and through the Defense Materials Procurement Agency, entered into a contract with the named libellant (hereinafter referred to as ICOMI, "contractor", "shipper", or "charterer"), a Brazilian corporation, calling for the exploration for and production of manganese ore in Brazil; establishing a line of credit in favor of ICOMI with the Export-Import Bank,

an agency of the United States Government; and providing for the disposition of the production of manganese ore by ICOMI to the United States Government through sale and purchase. Several months thereafter ICOMI entered into an agreement with the Export-Import Bank setting up a line of credit not to exceed $67,500,000 to assist ICOMI in financing the costs of equipment, materials, supplies, labor and services relative to the development of the project facilities in the mining, production and shipment of manganese ore from the Brazilian deposits. The details of the aforesaid contracts are not essentially pertinent to this controversy other than to illustrate the initial interest of the United States of America (hereinafter referred to as the "Government").[1] Upon certain terms and conditions therein specified the Government agreed to purchase manganese ore mined, produced and offered for sale by ICOMI in an aggregate amount up to 5,500,000 long tons over a period not extending beyond June 30, 1962. ICOMI was required to charter and dispatch the vessels necessary to transport all tonnage to the United States Atlantic port as designated by the Government, and to place standard ocean marine cargo insurance on the cargo, with loss payable to the Government or ICOMI "as their interest may appear". Manganese ore delivered to the Government was on a sales basis, C. I. F. United States Atlantic port of discharge, as designated by the Government. The contract provided an addendum stating that deliveries are made to the Government at the time the ore "is loaded on board vessel at Santana, with costs, ocean marine cargo insurance and ocean freight for the account of Icomi as provided in Contract DMP 46". Thus it follows that any loss sustained subsequent to loading was the Government's loss.

The manganese ore which is the subject of this controversy was shipped on respondent's vessel S/S Bonitas from Brazil on or about February 2, 1958, with Baltimore as its destination. Off the coast of North Carolina on February 18 the vessel ran into difficulties and began to sink. At approximately 1:30 a. m. on February 19 the vessel went down loaded with 9638.841 long tons of manganese ore in bulk. Several lives were lost, but at least two members of the crew were rescued and brought to Norfolk for hospitalization on or about February 22, 1958. A libel was filed on February 24 by William H. Muller & Company, Inc., and William H. Muller Shipping Corporation alleging that (1) said parties were the owner of the cargo being carried on the Bonitas, (2) agents and representatives of the respondent Italian corporation were then within the jurisdiction of the court conducting the business of said respondent, and (3) damages in the sum of $650,000 had been sustained by reason of the unseaworthiness of the vessel furnished by the respondent Italian corporation. While the libel designates P. S. Saglietto, Antioco Ravano, and *Mario* Ravano as the respondent's agents and representatives within the jurisdiction, the return of the United States Marshal reveals that service of the process, with a clause of foreign attachment, was made upon the respondent by delivering a copy to Antioco Ravano, *Carlo* Ravano, and Capt. P. S. Saglietto, the latter "admitting to be agent for the respondent".

Prior to any appearance on behalf of the respondent, the libel was amended to substitute ICOMI as libellant in place and stead of the original libellants; the application for substitution stating that the original libellants served only in the capacity as agents for an undisclosed principal. On February 28, 1958, an order was entered permitting the substitution by way of an amendment.

In due time the respondent, appearing specially, filed a motion to quash the service of process. The motion alleges in

1. Under the contract between ICOMI and the Bank, ICOMI irrevocably assigned to the Bank the first $15.00 for each long ton of manganese ore sold and delivered to the Government which became due and payable to ICOMI.

substance that (1) Antioco Ravino was neither an officer nor director of the respondent organization, (2) *Mario* Ravino was unknown to respondent, and no such individual acted in the capacity of officer, director or agent of the respondent organization,[2] and (3) the authority of Captain P. S. Saglietto was limited to acting for the Bonitas only while the vessel was in the United States. It is noted that the motion to quash does not contend Antioco Ravano was not an agent of respondent, and nothing is said with respect to *Carlo* Ravano. The motion does state that the respondent-owner of the vessel was not doing business within the jurisdiction of the court.

The respondent likewise filed exceptions to the jurisdiction, appearing specially for that purpose, which is essentially a motion to decline jurisdiction contending that (1) libellant is a Brazilian corporation, (2) respondent is an Italian corporation, (3) the S/S Bonitas flew the Italian flag, (4) the incident which forms the basis of libellant's claim did not arise within the jurisdiction of this court, and (5) the parties are not citizens doing business in this jurisdiction.

Several months thereafter libellant filed a cross-motion in opposition to the exceptions and motion to quash previously filed by respondent. This cross-motion requested affirmative relief in the nature of an order directing that Antioco Ravino and *Mario* Ravino be returned to Norfolk from Italy to give testimony relating to respondent's activities in Virginia and the individuals' activities in Virginia on the date of the service of process,[3] as well as an order directing P. S. Saglietto and the representative of Hasler & Company (a local shipping agency where service was effected) to give testimony along similar lines. The cross-motion further requests the entry of an order referring the issues to arbitration for determination and award, with a subsequent referral back to this Court for the entry of a final decree; the basis of referral to arbitration being grounded upon a clause in a charter party hereinafter mentioned.

At a hearing on June 12, 1958, the Court suggested that if any order was entered requiring the Messrs. Ravano to return to Norfolk, the expense of transportation would be imposed upon libellant as a condition to the entry of same. While no order was entered relative thereto, the libellant agreed that such a procedure was acceptable in lieu of taking testimony in Italy. The expense of bringing Saglietto from Baltimore to Norfolk would likewise be paid by libellant. The Court did not rule upon any of the several pending motions as proctors for respondent were not sufficiently advised as to the merits of libellant's cross-motion to refer to arbitration, and the Court expressed a desire to hear from an Italian law expert to ascertain the remedy, if any, available to libellant in the Italian courts.

Respondent, under its special appearance, thereafter answered libellant's cross-motion urging that respondent's motion to decline jurisdiction should be initially heard and determined, as a ruling in favor of respondent would render unnecessary the testimony on the motion to quash the service of process and the cross-motion to refer to arbitration. The answer to the cross-motion suggests cogent reasons why the referral to arbitration should be denied.

On November 12, 1958, a hearing was conducted for the purpose of receiving the testimony of an Italian law expert. The substance of this testimony is to the effect that libellant would have a remedy

2. Apparently respondent was referring to *Mario* Ravino as stated in the copy of the libel as served. The original libel was changed prior to filing to indicate Ravano. Service was made upon *Carlo* Ravano and not *Mario* Ravino.

3. It appears that proctors for all parties were unaware of the Marshal's return as to service upon Antioco Ravano and *Carlo* Ravano until the matter was directed to their attention by the Court at the hearing on April 6, 1959.

in the courts of Italy [4], but Italian law does not recognize agreements to arbitrate in another country.

At the November hearing proctors for libellant advised the Court that, only two days prior thereto, they had ascertained that the United States of America was actually the owner of the cargo in question, rather than ICOMI as previously asserted. The confusion arose by reason of the statement by General Services Administration in a letter dated February 26, 1958, to the effect that "General Services Administration has no interests in the cargo". The insurance proceeds following the loss were thereafter paid by Eagle Star Insurance Co., Ltd., (of England) to Muller. Later the Government discovered its error; the proceeds were paid by Muller to the Government, and the latter paid ICOMI for the material delivered on board the S/S Bonitas [5]. Cognizant of the fact that the interest, if any, of the Government would materially affect the proper consideration of respondent's motion to decline jurisdiction predicated upon the doctrine of *forum non conveniens*, and acting upon a request of proctors for libellant to defer ruling until such time as the interest and wishes of the Government could be ascertained as to possible intervention, a further postponement was granted.

The United States of America sought to file its petition for intervention on January 20, 1959; the petition admits the receipt of the proceeds of insurance aggregating $598,019.28 on or about June 5, 1958. It alleges that, to the extent of a variation in moisture content of the cargo, the claim for total market value of the manganese ore is vested in ICOMI, but, to the amount of the insurance proceeds, the claim is the interest of the Government *for the account of its cargo underwriters*. Respondent objected to the filing of the intervening petition whereupon the Court ordered the same "lodged" and fixed a date for determining the propriety of permitting the intervening petition to be filed.

At this stage of the proceedings there are, therefore, four motions for consideration, namely:

(1) Respondent's motion to quash the service of process;

(2) Respondent's motion to decline jurisdiction under the doctrine of *forum non conveniens;*

(3) Libellant's (ICOMI) motion to refer the matter to arbitration;

(4) The Government's motion to intervene as a party libellant. Ancillary to respondent's motion to quash the service of process is libellant's (ICOMI) motion for an order directing the taking of testimony in Norfolk on the issue of respondent's doing business in Virginia.

Acceding to respondent's request that the motion to decline jurisdiction should be initially determined, the Court deems it proper to consider the Government's motion to intervene at the same time. If the motion to intervene is denied, the motion to decline jurisdiction is entitled to meritorious consideration, subject to reasonable conditions imposed by the Court, under Canada Malting Co., Ltd. v. Paterson Steamships, Ltd., 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837. As in Canada Malting, this is an *in personam* process. Absent the right of the Government to intervene, the proper exercise of discretion would lead to the belief that this controversy, otherwise entirely between aliens, should be litigated in a more convenient forum. The Government is undoubtedly a nominal party, but respondent advances the theory that the real party in interest is the Eagle Star Insurance Co., Ltd., an English corporation. Nevertheless, the Government desires to assert its claim for the account of its cargo underwriters. The intervening petition makes no reference to any

---

4. Libellant's rights in Italy would be conditioned upon reciprocity being given to an Italian citizen in Brazil.

5. In the interim, Muller had paid the Export-Import Bank a substantial sum for the account of ICOMI (see footnote 1), and this sum was deducted in further accounting.

public interest sought to be asserted; nor is it alleged that any portion of the recovery would inure to the benefit of the Government.[6] True, at the time of the filing of the original libel the Government had a claim as the owner of the cargo, but the intervention was not sought until approximately seven months after the Government's claim had been fully paid.

In oral argument there was some suggestion that the insurance was paid by an American insurance company as the wholly owned subsidiary of the Eagle Star Insurance Co., Ltd., the English company. But the record is silent as to this point and all documentary evidence reveals Eagle as the insurance carrier.

■ The authorities do not support the right of the United States, as a fully paid insured, to intervene in this action for the account of its cargo underwriters, where the suit is instituted by another insured (ICOMI) against the carrier for the loss of the cargo. Undeniably, Eagle Star Insurance Co., Ltd., could intervene, but the controversy would then remain between aliens.

True, the Government was originally a third party beneficiary under the contract of insurance by reason of the loss payable clause, but the payment in full of the loss sustained by the Government clearly discharged the rights and obligations of the parties in respect to the protection of the interest of the United States in the lost cargo. In Fretz v. Bull, 12 How 466, 468, 53 U.S. 466, 468, 13 L.Ed. 1068, it is said:

"In admiralty, the party entitled to relief should always be made libellant; and the practice of instituting a suit in the name of one person for the benefit of another, to whom the right has been transferred, only obtains in particular cases."

In the cited case libellant's insurance only *partially* covered his loss and he was permitted to maintain the action for the "use of" his insurer. By analogy, if libellant had been fully paid for his loss, the action could have been maintained only in the name of the insurer. Benedict, Admiralty (6th Ed.), Vol. 2, § 245; New Hampshire Fire Ins. Co. v. The Perla, D.C.Md., 84 F.Supp. 715.

■ Although the Federal Rules of Civil Procedure are not applicable in admiralty, and the General Admiralty Rules contain no "real party in interest" rule such as Rule 17 of the Federal Rules of Civil Procedure, 28 U.S.C.A., in light of Fretz v. Bull, supra, the controlling principles are essentially the same. In United States v. Aetna Casualty & Surety Co., 338 U.S. 366, 381, 70 S.Ct. 207, 215, 94 L.Ed. 171, it was stated in construing Rule 17:

"If the subrogee has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name."

If we were called upon to consider the question of permissive intervention under Rule 24, Federal Rules of Civil Procedure, the result would be the same. There is no statute conferring any right of intervention, the Government has no pecuniary interest in the litigation, and no "public interest" is asserted. In S. E. C. v. United States Realty & Improvement Co., 310 U.S. 434, 459, 460, 60 S.Ct. 1044, 84 L.Ed. 1293, it was said that the United States was entitled to intervene in the "public interest" under Rule 24, F.R.C.P., irrespective of whether the intervenor had any direct personal or pecuniary interest in the subject of the litigation, but it cannot be said that the right of the Government to intervene exists in *all* cases where it has neither a personal pecuniary interest nor a "public interest" to assert or protect.

6. Insurance was placed by ICOMI for the full amount of the market price of manganese ore deliver at the American port. It is difficult to understand how the Government has a financial interest in the damages sought to be recovered under such circumstances and, as noted, the intervening petition merely alleges the desire to intervene as being "for the account of its cargo underwriters".

In any event, the right of the Government to intervene under Rule 24(b), F.R.C.P., is apparently discretionary with the court even where the Government has agreed to "save harmless" a contractor involved in litigation. E. I. DuPont de Nemours & Co. v. Lyles & Lang Construction Co., 4 Cir., 219 F.2d 328, certiorari denied 349 U.S. 956, 75 S.Ct. 882, 99 L.Ed. 1280.

Finally, and again considering the Federal Rules of Civil Procedure, we note in Moore, Federal Practice (2d Ed.), Vol. 3, § 17.15, p. 1337, the rule is stated:

> " * * * apart from statute, actions in the name of the United States for the benefit of an individual or the public can be maintained only upon a showing that a definite obligation existed toward the individual to be benefitted or that the public interest involved creates a duty on the part of the United States to act as *parens patriae*."

It is not here urged or alleged that the United States has any definite obligation to maintain this action for Eagle. United States v. Union Pacific R. Co., 98 U.S. 569, 25 L.Ed. 143, and United States v. San Jacinto Tin Co., 125 U.S. 273, 286, 8 S.Ct. 850, 857, 31 L.Ed. 747, in which latter case it is noted:

> "[I]f there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstances. * * * [If it] is manifest that the suit has actually been brought for the benefit of some third person, and that no obligation to the general public exists which requires the United States to bring it, then the suit must fail."

The language in these cases is peculiarly appropriate when considered in the light of the admiralty proceeding as set forth in Fretz v. Bull, supra.

Holding that the interest, if any, of the United States is not sufficient to permit it to intervene, we turn to libellant's motion to refer the matter to arbitration. This requires a brief summary of the charter party agreements. Ocean Shipping and Trading Corporation (referred to as Ocean) acted as agent for a Panamanian shipowning corporation known as Cia. Naviera Continental, S. A. (hereinafter called Continental). As such agent Ocean, on August 7, 1957, entered into a contract with William H. Muller Shipping Corporation (referred to as Muller), the latter being the United States selling agent for ICOMI. This contract contained no reference to any arbitration clause, but did call for shipments of 115,000 to 125,000 long tons of manganese ore from Brazil to United States during 1958. It had nothing to do with the present respondent.

Continental was unable to provide a vessel for the February, 1958, shipment. A charter party dated November 9, 1957, was then executed by Muller, acting for the respondent,[7] and Ocean, referred to as agent for "charterers". Actually, the charterer was ICOMI who already had a binding commitment from Continental to provide a vessel. The affidavits firmly establish that Ocean had no authority to execute the November charter party as agent for ICOMI. In effect, Continental was forced into the position of being a "charterer" for the reason that no vessel was available. While the November charter party did contain an arbitration clause, it was in reality an agreement to arbitrate disputes between Continental and the respondent, and not those arising between ICOMI and respondent.

The shipment in question was transported under a bill of lading dated February 2, 1958, which contained no arbitration provision. ICOMI was described as the shipper. In the consignee clause of the bill of lading it is provided that the goods shall be delivered "unto ——— or to ——— Assigns he or they paying

---

**7.** It should be noted that in the August charter party, Muller acted for ICOMI, but in the November charter party Muller acted for respondent.

freight for the same, and all other conditions and exceptions as per CHARTER PARTY AS dated ————————".

▮ While ICOMI was the shipper of the cargo, it was not a party to the charter party and it is abundantly clear from the authorities that arbitration cannot be required of those who were not parties to the agreement, either directly or through their agents. Instituto Cubano De Estabilizacion Del Azucar v. T/V Golden West, 2 Cir., 246 F.2d 802, certiorari denied 355 U.S. 884, 78 S.Ct. 152, 2 L.Ed.2d 114. Reliance upon a bill of lading which fails to make specific reference to the charter party affords no relief. Southwestern Sugar & Molasses Co., Inc., v. The Eliza Jane Nicholson, D.C.S.D.N.Y., 126 F.Supp. 666. Son Shipping Co., Inc. v. DeFosse & Tanghe, 2 Cir., 199 F.2d 687, provides that a charter party may be incorporated into a bill of lading by reference, but the reference must be sufficiently specific as to leave no doubt as to the intention of the parties.

The foregoing discussion makes it unnecessary to consider the remaining points raised by respondent that (1) an agreement to arbitrate does not include a total loss of cargo, (2) libellant has waived its right to demand arbitration by instituting this action, and (3) to require arbitration would restrict respondent's right to limit liability.

▮ For reasons heretofore mentioned it is perhaps inappropriate to consider respondent's motion to quash the service of process. From the statements of proctors it is suggested that the Bonitas and the respondent carried on business within Virginia at regular intervals which would appear to meet the quantitative and qualitative tests for the operation of a shipping business. As the respondent's motion to decline jurisdiction will be granted with modifications, the motion to quash will remain open pending further proceedings.

This Court has recently followed the practice of staying proceedings for a reasonable period of time in cases involving the doctrine of *forum non conveniens* to enable libellant to maintain its action elsewhere. By so doing the matter remains in the discretion of the Court to the end that if libellant is able to establish unquestioned prejudice by being required to seek another forum, or has otherwise lost its right to institute suit, the discretion may be reconsidered in the light of further developments. However, should there remain any doubt as to the right of appeal from the order staying proceedings, the Court will, at the request of libellant, enter an order declining jurisdiction and dismissing the action, or, in the alternative, consider a motion to grant an appeal from the interlocutory order to be entered staying proceedings.

Present order.