### INDUSTRIA E. COMERCIO DE MINERIOS, S.A., Libellant,

v.

### NOVA GENUESIS SOCIETA PER AZIONI PER L'INDUSTRIA ET IL COMMERCIO MARITIMO, Respondent.

No. 7933.

United States District Court
E. D. Virginia,
Norfolk Division.

Sept. 18, 1961.

George B. Warburton, New York City, Michael B. Wagenheim, Norfolk, Va., for libellant.

Leon T. Seawell, Jr., Norfolk, Va., William A. Grimes, Baltimore, Md., for respondent.

WALTER E. HOFFMAN, District Judge.

Following this Court's opinion of April 15, 1959 (172 F.Supp. 569), libellant (ICOMI) made application for a rehearing supported by affidavits and additional

exhibits. The rehearing was granted and the matter has now been argued and submitted based upon additional facts not referred to in the prior opinion. For reasons herein stated the Court adheres to its previous ruling as supplemented by this memorandum.

When this matter was previously before the Court, it was stated by all proctors that the facts had been fully disclosed. From what has been subsequently presented, it appears that the procedure adopted in paying the insurance proceeds for the cargo loss was not completely developed. When the loss initially was paid by a draft issued by Talbot, Bird & Company, for the account of Eagle Star Insurance Co., Ltd. of London, payable to ICOMI, it was pursuant to a loan receipt executed by ICOMI. The payment under a loan receipt by the insurer is an accepted procedure in business transactions. Luckenbach v. J. W. McCahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 55, 63 L.Ed. 170. As was said in the cited case:

> "If, and to the extent (less expenses) that, recovery is had, the insurers will receive payment or be reimbursed for their so-called loans to the shipper. If nothing is recovered from the carrier, the shipper will retain the money received by it without being under obligation to make any repayment of the amounts advanced. In other words, if there is no recovery here, the amounts advanced will operate as absolute payment under the policies."

As discussed in the prior memorandum, the libellant (ICOMI) is an alien; the respondent is an alien; and Eagle Star Insurance Co., Ltd. is an alien. After Eagle Star made payment to ICOMI, it was ascertained that title to the cargo had passed to the United States prior to the sinking of the vessel. Although the Government had originally agreed to accept a withdrawal of the shipper's tender of this cargo, and had affirmatively stated that it had no interest in the cargo, all as evidenced by its letter dated February 26, 1958, from the Director of the Charter and Routing Division, it subsequently renounced this agreement by denying the authority of its apparent agent. The Government thereupon declined to accept the substitute shipment of manganese ore and insisted upon its rights under the insurance contract.

Apparently Wm. H. Muller & Co., Inc., then acting as agent for ICOMI (the shipper), was successful in securing repayment of the insurance proceeds from ICOMI. We next find where, on March 28, 1958, Wm. H. Muller & Co., Inc., by the personal check of Paige A. Moore, its treasurer, paid the Export-Import Bank the sum of $144,582.62, all of which was pursuant to a contract between ICOMI and the Bank which constituted an irrevocable assignment as to the first $15 for each long ton of manganese ore sold and delivered to the Government. This payment was made with the approval of the Government after the Government concluded that delivery had been effected in Brazil. It was not made pursuant to any loan receipt. Following an exchange of correspondence, it was on June 6, 1958, that Wm. H. Muller & Co., Inc., by the personal check of Paige A. Moore, paid General Services Administration the sum of $453,436.66, which check was deposited to the credit of the Treasurer of the United States. The two payments aggregate $598,019.28, which is the exact amount previously paid by the draft of Talbot, Bird & Co., Inc., acting as agent for Eagle Star Insurance Co., Ltd., under date of March 6, 1958, which was made under a loan receipt.

The short answer to the contention advanced by ICOMI and the Government is that the payment to General Services Administration was not pursuant to a loan receipt. The fact that ICOMI executed a loan receipt cannot carry with it any suggestion that the Government accepted Moore's check under like conditions. The payment to the Government was complete, final and binding.

Immediately following receipt of Moore's check in the sum of $453,436.66, the Government paid the contractor's

(ICOMI) invoice in the sum of $543,-653.89. Thus it appears that the Government received from the insurance proceeds an excess of $54,365.39 over and above the amount it was required to pay to ICOMI.

We are now told that Eagle Star, a foreign insurance company, had an *oral* pooling agreement with four other companies, and that the loss was, in reality, paid as follows:

| | |
|---|---|
| Eagle Star Insurance Company, Ltd. | 32½% |
| Universal Insurance Company | 32½% |
| Buffalo Insurance Company | 12½% |
| Caledonia Insurance Company | 15% |
| Swiss Reinsurance Company | 7½% |

Two of these companies, Universal and Buffalo, are corporations organized and existing under the laws of New Jersey and New York respectively. For this reason, among others, ICOMI and the Government suggest that interests of corporate citizens of the United States are at stake and the Court should exercise jurisdiction. These interests, assuming their existence, have not attempted to intervene, unless such efforts are disclosed by the petition of intervention filed by the United States asserting an interest of the United States of America "for the account of its cargo underwriters". So far as the Government was concerned, Eagle Star, the alien corporation, was the sole underwriter.

At the outset we are met with the contention advanced by respondent that, in an *in personam* action, intervention is not permitted in Admiralty. It is suggested that Admiralty Rules 34 and 42 contain the only provisions with respect to intervention. As Rule 42 pertains to claims against proceeds in the registry of the court, it is unnecessary further to consider the possible application of this rule. Libellant counters with the proposition that the procedure adopted was merely to amend the libel under Admiralty Rule 23, 28 U.S.C.A. Initially the issue was raised by the petition of intervention lodged by the United States, and it was on the motion to permit said petition to be filed that the hearing was had on April 6, 1959, which resulted in the court's memorandum of April 15, 1959 (172 F. Supp. 569). This petition for intervention concludes with the following prayer:

"Wherefore petitioner prays that it may be permitted to intervene herein as if originally specifically named a party entitled to assert and prosecute the claim, demands and causes of action with respect to the cargo hereinabove described and as to which libelant, Industria e Comercio de Minerios, S. A. sued as shipper, and that petitioner jointly with said Industria e Comercio de Minerios, S. A. jointly be permitted to pursue this litigation to final decree, and that petitioner recover the amount of its damages as aforesaid with interest and costs and disbursements separate and apart from such damages as are claimed or might be the interest of libelant, Industria e Comercio de Minerios, S. A., and that this Court direct that the libel herein be amended so as to join both petitioner and libelant, and that all further proceedings herein be undertaken in the joint name of petitioner and libelant, and that this Court will grant such other and further relief as may be just and proper in the premises."

Irrespective of the foregoing, the right to intervene must be considered before determining the right to amend the libel. It must be remembered that the request to intervene came many months after the United States had received full payment of its claim in the form of a check from Paige A. Moore, presumably acting in behalf of Wm. H. Muller & Co., Inc., who, assumedly, had been reimbursed by ICOMI, the latter having received the entire proceeds of the loss from Eagle Star Insurance Company, Ltd.

It would not appear that Rule 23 is applicable to this set of facts. Authorities relied upon by the proposed intervenor are inapposite. In Keystone Telephone Co. v. United States, D.C.E.D.N.Y., 49 F.Supp. 508, the right to amend in-

volved only the substitution of Eastern Telephone & Telegraph Company, a wholly owned subsidiary of Keystone. The motion to amend the libel emanated from Keystone, the original libellant. The action was instituted under the Suits in Admiralty Act, 46 U.S.C.A. §§ 741–752, which provides for an election to proceed in accordance with the principles *in rem*. We think that Keystone Telephone Co. was correctly decided, but does not meet the test of the situation here presented.

Reliance upon Levinson v. Deupree, 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319, is similarly misplaced. This case was a libel *in personam* wherein the appointment of libellant, as ancillary administrator of decedent's estate, was void under Kentucky law in that the qualification was not in the county where the cause of action arose. After the one-year period of limitation had run in accordance with the Kentucky wrongful death statute, libellant qualified as ancillary administrator in the county where the death occurred. An amended libel was then filed, alleging the same facts as stated in the original libel, but further stating the later qualification as ancillary administrator. When the case finally reached the Supreme Court, the court said (345 U.S. 652, 73 S.Ct. 916, 97 L.Ed. 1319):

"We hold that the federal practice controls the question whether the administrator, holding an effective appointment under Kentucky law, should be permitted to amend his libel so as to allege that appointment, at a time when the applicable statute of limitations would bar a new suit. And we hold that the administrator should be permitted to to do so. Rule 23, Rules of Practice in Admiralty and Maritime Cases [28 U.S.C.A.]; cf. New York Central R. Co. v. Kinney, 260 U.S. 340, 346 [43 S.Ct. 122, 123, 67 L.Ed. 294.]"

From the above we note that this was a simple amendment to the libel, as contrasted with a petition for intervention. Nor do we believe that American Tobacco Company v. Goulandris, D.C.S.D. N.Y., 173 F.Supp. 140, 157, is in any different category. We must remember that the attempted intervention of the United States is essentially for the purpose of refuting respondent's motion to decline jurisdiction under the doctrine of *forum non conveniens,* as otherwise the controversy is solely between aliens.

While the factual situation in Ex parte Indiana Transportation Co., 244 U.S. 456, 37 S.Ct. 717, 61 L.Ed. 1253, is not identical, the principle enunciated therein would seem to apply to the pending litigation. The only possible jurisdiction in the present action is the *in personam* process served upon respondent's alleged agents and representatives who were in Norfolk attending the funeral services of various crew members who lost their lives when the Bonitas sank on February 19, 1958. The special appearance and motion to quash the service of process has not, as yet, been the subject of any ruling by this Court. Thus we have a situation in which the purported service of *in personam* process was made at a time when Wm. H. Muller & Co., Inc., was the libellant. Prior to any appearance ICOMI was substituted as a party libellant in place and stead of Wm. H. Muller & Co., Inc. Thus, when the special appearance was noted, the respondent was only required to meet the libel of ICOMI. In Ex parte Indiana Transportation Co. there was a libel *in personam* against the Indiana corporation seeking the recovery of damages for the death of one Dawson when the corporation's vessel capsized. Service of the citation was made upon an agent of the corporation found within the district. Eleven months later the district court entered an order granting 373 other libellants leave to intervene for causes of action for death due to the same disaster. In directing the issuance of a writ of prohibition, the Supreme Court said:

"The foundation of jurisdiction is physical power. If a defendant's body were in custody by arrest, or a vessel were held by proceedings *in rem,* it well might be that new

claims would be entertained against the person or against the ship, in addition to those upon which the arrest was made. The Oregon, 158 U. S. 186, 210 [, 15 S.Ct. 804, 39 L.Ed. 943]. But appearance in answer to a citation does not bring a defendant under the general physical power of the court. He is not supposed even by fiction, to be in prison. Conventional effect is given to a decree after an appearance because when power once has been manifested, it is to the advantage of all not to insist upon its being maintained to the end. Michigan Trust Co. v. Ferry, 228 U.S. 346, 353 [, 33 S.Ct. 550, 57 L.Ed. 867]. That, however, is the limit of the court's authority. Not having any power in fact over the defendant unless it can seize him again, it cannot introduce new claims of new claimants into an existing suit simply because the defendant has appeared in that suit. The new claimants are strangers and must begin their action by service just as if no one had sued the defendant before. The Oregon, 158 U.S. 186, 205, 210 [, 15 S.Ct. 804, 39 L.Ed. 943]. We may repeat with more force concerning defendants what was said *alio intuito* in a New Jersey case cited in Reynolds v. Stockton, 140 U.S. 254, 268 [, 11 S. Ct. 773, 35 L.Ed. 464]. 'Persons by becoming suitors do not place themselves for all purposes under the control of the court.' "

■ The United States argues that its desire to intervene in the present controversy does not introduce a new claim. To the contrary, it should be noted that the original libel seeks no relief in behalf of cargo underwriters and makes no reference to any insured cargo, whereas, the petition to intervene injects many new matters into the case and seeks a recovery "in the interest of petitioner, United States of America, for the account of its cargo underwriters." While the basic right of recovery centers around a cargo loss involving an alleged unseaworthy vessel, the claim of the United States differs substantially from that of ICOMI, the substituted libellant.

For other authorities denying the right to intervene in pending *in personam* admiralty proceedings, see Defense Plant Corporation v. United States Barge Lines, 2 Cir., 145 F.2d 766, 767; Sheldrake v. The Chatfield, D.C.E.D.Va., 52 F. 495.

■ The foregoing effectively disposes of the right to intervene. At the time of reargument proctors for the attempted intervenor attacked that portion of the prior opinion (172 F.Supp. 574, 575) which relies upon Fretz v. Bull, 12 How. 466, 468, 53 U.S. 466, 468, 13 L.Ed. 1068. The attention of the Court is directed to the later case of The Propeller Monticello v. Madison, 17 How. 152, 58 U.S. 152, 15 L.Ed. 68. To the extent that this Court previously attempted to draw an analogy by stating that if a libellant had been fully paid for his loss, the action could have been maintained only in the name of the insurer, the prior opinion appears to be erroneous. This does not, however, alter the fact that the United States, as a fully paid insured, is under no obligation to intervene in this action for the benefit of its cargo underwriters. To inject the United States into the litigation for the sole purpose of persuading the Court to overrule respondent's motion to decline jurisdiction under the doctrine of *forum non conveniens* would subject the respondent, originally called upon to answer a claim of the shipper, ICOMI, to a continuing *in personam* process of this Court. It would do violence to what the Supreme Court has said cannot be done, i. e., parties becoming suitors do not place themselves for all purposes under the control of the court.

As amended by this memorandum, the Court adheres to its prior ruling. Present decree on notice.